**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

ANDRE G. BOUCHARD
CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: March 13, 2018
Date Decided: June 7, 2018

Carmella P. Keener, Esquire
P. Bradford deLeeuw, Esquire
Rosenthal, Monhait & Goddess, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19801

Samuel A. Nolen, Esquire
Elizabeth A. DeFelice, Esquire
Ryan P. Durkin, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

RE:     ***Full Value Partners, L.P. v. Swiss Helvetia Fund, Inc., et. al.***
        Civil Action No. 2017-0303-AGB

Dear Counsel:

This letter constitutes the court's decision on plaintiff's motion for an award

of attorneys' fees and expenses. For the reasons explained below, the motion is

granted, and plaintiff will be awarded $300,000.

## I.     Background[1]

Plaintiff Full Value Partners, L.P. is a Delaware limited partnership and

stockholder of Swiss Helvetia Fund, Inc. ("Swiss Helvetia" or the "Fund").

Defendant Swiss Helvetia is an investment company that focuses on publicly

traded equity securities of Swiss companies. Swiss Helvetia is currently managed

---

[1] The facts recited herein are taken from the Amended Complaint filed on April 20, 2017
(Dkt. 4) and the parties' submissions in connection with the fee application.

by Schroder Investment Management North America Inc., which performs investment advisory functions.

At the times relevant to this action, Swiss Helvetia had a classified board consisting of three classes of directors serving three-year terms (the "Board"), and had in place a bylaw requiring that Board nominees have certain "relevant experience and country knowledge."[2] Specifically, Article II, Section 2 of the Fund's bylaws (the "Qualification Bylaw") stated, in relevant part, as follows:

> To be eligible for nomination as a Director a person must, at the time of such person's nomination, have Relevant Experience and Country Knowledge (as defined below) and must not have any Conflict of Interest (as defined below). Whether a proposed nominee satisfies the foregoing qualifications shall be determined by the Board of Directors.
>
> "Relevant Experience and Country Knowledge" means experience in business, investment and economic matters in Europe, the United States, or Switzerland or political matters of Switzerland through service:
>
> (a) for at least 5 years in one or more of the following principal occupations:
>
> (1) senior executive officer, including senior legal officer, or partner of a financial or industrial business headquartered in Europe that has annual revenues of at least the equivalent of US

---

[2] On or about February 22, 2017, the Board amended the Fund's Amended and Restated By-Laws dated June 19, 2013. Am. Compl. ¶ 15. The Qualification Bylaw appears in both the 2013 and 2017 bylaws and the bylaws dated September 24, 2014 that defendants submitted with the Berris Affidavit. *See* Am. Compl. Ex. B Art. II. § 2, Defs.' Opp'n Br. Ex. B Art. II § 2, Berris Aff. Ex. A Art. II § 2.

$500 million and whose responsibilities include or included supervision of European business operations;

(2) senior executive officer, including senior legal officer, or partner of a financial or industrial business headquartered in the United States that has annual revenues of at least the equivalent of US $500 million and whose responsibilities include or included supervision of European business operations;

(3) senior executive officer, including senior legal officer, or partner of an investment management business having at least the equivalent of US $500 million under discretionary management for others in securities of European companies or securities principally traded in Europe;

(4) senior executive officer or partner (including a lawyer appointed "of counsel") (i) of a business consulting, accounting or law firm having a substantial number of professionals, and (ii) one of whose principal responsibilities includes or included providing services involving European matters or clients for financial or industrial businesses or investment businesses as described in (1) - (3) above;

(5) senior official (including ambassador or minister or elected member of the legislature) in the national or cantonal government, a government agency or the central bank of Switzerland, in a major supranational agency or organization of which Switzerland is a member, in a leading international trade organization relating to Switzerland, in each case in the area of finance, economics, trade or foreign relations, or in a self-regulatory organization with direct or indirect responsibility for investment or sales practices related to registered investment companies;

(6) director of this Corporation at the time of nomination for at least five years; or

(7) officer, director, partner, or employee of the Corporation's investment advisor or of an entity controlling,

controlled by or under common control with the Corporation's investment advisor; and

(b) for at least 10 years as a senior executive officer (including senior legal officer), director, partner, or senior official (including elected ambassador or minister or elected member of the legislature) of one or more of the following: (1) a financial or industrial business; (2) an investment management business; (3) a business, consulting, accounting or law firm; (4) a national government, a government agency or central bank, a major supranational agency or organization, or a leading international trade organization, in each case in the area of finance, economics, trade or foreign relations; or (5) a self-regulatory organization with direct or indirect responsibility for investment or sales practices related to registered investment companies.[3]

On June 23, 2016, Swiss Helvetia's stockholders elected one Class I director at its annual meeting.[4] That same day, after the annual meeting ended, the Board issued a press release announcing that it had appointed Margaret Cannella as a director of the Fund. The press release provided certain background information about Cannella but did not explain how she satisfied the relevant experience and country knowledge provision of the Qualification Bylaw and did not indicate that the Board had made that determination.[5]

On December 6, 2016, the Board appointed Jay Calhoun, "a director serving on the Board of the Schroder family of mutual funds," to fill Cannella's position as

---

[3] Am. Compl. Ex. B. Art. II. § 2; Defs.' Opp'n Br. Ex. B. Art. II. § 2.

[4] Am. Compl. ¶ 25.

[5] Berris Aff. Ex. B at 1-2; *see also* Am. Compl. ¶ 27.

a director of the Fund after Cannella passed away in November 2016.[6]  The press release provided certain background information about Calhoun but did not explain how he satisfied the relevant experience and country knowledge provision of the Qualification Bylaw and did not indicate that the Board had made that determination.[7]

In March 2017, plaintiff informed the Board that it intended to nominate as directors Phillip Goldstein, Andrew Dakos, Moritz Sell, and Thomas Mazarakis.[8] In response, the Board informed plaintiff that "it appears that neither [Goldstein] nor Mr. Dakos satisfy the Fund's Director nominee qualification provisions" and if that is the case, "they may not be properly considered for election at the 2017 Annual Meeting."[9]

On April 17, 2017, Swiss Helvetia announced in a press release that Jean-Marc Boillat had resigned from the Board and been replaced by Fred Ricciardi and that Ricciardi would stand for election at the 2017 annual meeting.[10]  The press release provided certain background information about Ricciardi but did not explain how he satisfied the relevant experience and country knowledge provision

---

[6] Am. Compl. ¶¶ 10, 29.

[7] Berris Aff. Ex. C at 1; *see also* Am. Compl. ¶ 30.

[8] Am. Compl. ¶ 39; Berris Aff. ¶¶ 18-19; Shahmoon Reply Aff. Ex. I at 1.

[9] Shahmoon Aff. Ex. A at 1-2; Am. Compl. ¶ 40.

of the Qualification Bylaw and did not indicate that the Board had made that determination.[11]

The April 17 press release also announced David Bock's plan to resign and the Board's nomination of Jean Hoysradt as his replacement.[12]   As was the case with the Fund's three prior Board appointments, the press release provided certain background information about Hoysradt but did not explain how she satisfied the relevant experience and country knowledge provision of the Qualification Bylaw and did not indicate that the Board had made that determination.[13]

On April 19, 2017, plaintiff filed its initial complaint, which it amended on April 20, 2017.  The Amended Complaint contained four counts.  The key claim was Count III.[14]  It asserted that the members of the Board breached their fiduciary duties by inequitably applying the Qualification Bylaw against two of plaintiff's nominees (Goldstein and Dakos) to preclude them from seeking election to the Board at the Fund's next annual stockholders meeting.

---

[10] Am. Compl. ¶ 41; Berris Aff. Ex. D at 1.

[11] Berris Aff. Ex. D at 1; *see also* Am. Compl. ¶ 45.

[12] Am. Compl. ¶ 42; Berris Aff. Ex. D at 1.

[13] Berris Aff. Ex. D at 1; *see also* Am. Compl. ¶ 46.

[14] Count I challenged the Board's decision in June 2016 to appoint Cannella to fill a vacancy on the Board; Count II challenged certain disclosures in the Fund's proxy statement relating to the 2016 election; and Count IV concerned a proposal plaintiff intended to present at the 2017 annual stockholders' meeting to terminate the Fund's contract with its current investment advisor.

On May 2, 2017, the court denied plaintiff's motion for an expedited trial to be held before the Fund's 2017 annual stockholders meeting, which was scheduled for June 27, 2017.  With respect to Count III, the court found that expedition was not necessary because—in a change of position—Swiss Helvetia decided that it would count the votes for all of plaintiff's nominees.  This meant that the court could provide relief after the meeting (if necessary) and obviated the need to adjudicate the claim on an expedited basis before the meeting.[15]

At the June 27, 2017 annual meeting, the Board and plaintiff each ran three candidates.  The Fund's stockholders elected one of plaintiff's nominees (Sell) and one of the Board's nominees (Hoysradt) as Class I and Class III directors, respectively.[16]  Dakos, another of plaintiff's nominees, received a majority of votes for the Class II position but was not seated because the Board determined that he did not satisfy the Qualification Bylaw.[17]  On August 18, 2017, the Board announced that it was seating Dakos notwithstanding its belief that he did not satisfy the Qualification Bylaw.[18]

---

[15] Tr. 6-9 (May 2, 2017) (Dkt. 25).

[16] Berris Aff. ¶ 32, Ex. I at 1.

[17] Berris Aff. ¶¶ 31-32, Ex. I at 1.

[18] Berris Aff. ¶ 33.

On September 15, 2017, plaintiff filed an unopposed motion to dismiss this action as moot with the court retaining jurisdiction to consider a fee application. The court granted the motion that day. On November 1, 2017, plaintiff filed the pending motion for an award of attorneys' fees and expenses. On or about December 4, 2017, Swiss Helvetia amended its Bylaws to eliminate the country knowledge provision (*i.e.*, subsections 2(a)(1)-(7)) of the Qualification Bylaw.[19]

## II.    Analysis

Plaintiff seeks a fee award of $400,000 under the corporate benefit doctrine for essentially two alleged benefits: (1) vindicating the franchise rights of the Fund's stockholders by facilitating the election and seating of a director (Dakos) who the Fund had opposed before this litigation was filed for failing to satisfy the Qualification Bylaw and (2) effectively preventing the Board from using the Qualification Bylaw to preclude future stockholder nominees.[20]

To obtain an award under the corporate benefit doctrine, plaintiff must show "(1) the suit was meritorious when filed; (2) the action producing [a] benefit to the corporation was taken by the defendants before a judicial resolution was achieved; and (3) the resulting corporate benefit was causally related to the lawsuit."[21]

---

[19] Shahmoon Reply Aff. Ex. J at 3-4.

[20] Mot. for Attorneys' Fees at 1, 7.

[21] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

Defendants do not dispute the second element (causation) for purposes of this motion but contend that this action was not meritorious when filed and did not produce a corporate benefit.[22]  I address these two issues in turn.

## A.      This Action was Meritorious When Filed

A claim is meritorious when filed "if it can withstand a motion to dismiss on the pleadings [and] plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success.  It is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable hope."[23]

Here, plaintiff's primary claim (Count III) was based on the doctrine enunciated in *Schnell v. Chris-Craft Industries, Inc.*[24]  There, our Supreme Court held that a board could not take action, even if that action was "legally possible," for the "inequitable purposes" of "perpetuating itself in office" and "obstructing the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management."[25]  Based on this venerable principle, the Amended Complaint contends that the Board did not apply the

---

[22] Tr. 37 (Mar. 13, 2018) (Dkt. 56).

[23] *Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1966).

[24] 285 A.2d 437, 439 (Del. 1971).

[25] *Id.*

Qualification Bylaw "equally and in the same way to its own nominees and appointees as it [did] to the director nominees selected by shareholders" and instead held "the nominees selected by shareholders to a much higher standard and [precluded] those nominees from seeking election to or serving on the Board."[26]

Insofar as the merits of Count III are concerned, the gravamen of defendants' opposition is that plaintiff "has failed to demonstrate that it possessed 'knowledge of provable facts' that held out some reasonable likelihood of success" under this theory.[27] In particular, defendants challenge as conclusory plaintiff's allegations concerning the four Board nominees identified in the Amended Complaint (Cannella, Calhoun, Ricciardi, and Hoysradt) because plaintiff alleged only that each of them did not "appear" to satisfy the relevant experience and country knowledge provision of the Qualification Bylaw.[28] Defendants further contend that plaintiff's lack of "knowledge of provable facts" is made evident by an affidavit of Brian Berris, Chairman of the Fund's Board, which was submitted with their opposition. Berris attests in his affidavit that each of the Board's four

---

[26] Am. Compl. ¶ 80.

[27] Defs.' Opp'n Br. at 15.

[28] *Id.* at 14-15 (citing Am. Compl. ¶¶ 27, 30, 80, 81).

nominees in fact satisfied subsection 2(a)(3) of the Qualification Bylaw.[29]  I

disagree with defendants' position on the merits for essentially three reasons.

First, defendants elevate form over substance in focusing on plaintiff's use

of the qualifier "appear" in the Amended Complaint when challenging the

qualifications of the Board's nominees.[30]  Fairly read, the allegations in question

make the point that the Board's nominees did not satisfy the Qualification Bylaw

based on information the Company provided in press releases it issued

contemporaneously with their nominations.  Use of the qualifier "appear" in

making those allegations simply left open the possibility that this conclusion might

be disproven based on other (undisclosed) information.

Second, defendants' reliance on an affidavit prepared well after this action

was filed for the purpose of showing that plaintiff did not possess "knowledge of

provable facts" is misplaced.  The "pertinent time" to determine whether "plaintiff

had pleaded provable facts which showed that his action had reasonable hope of

success . . . is the time of filing:"[31]

> The question of merit for the purposes of compensation is properly
> determined as of the commencement of the lawsuit and not by

---

[29] Berris Aff. ¶¶ 9, 12, 24, 25.  Berris asserts that Ricciardi also satisfied subsection 2(a)(2) of the Qualification Bylaw.  *Id.* ¶ 24 n. 4.

[30] *See* Am. Compl. ¶¶ 27, 30, 44, 81.

[31] *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 879 (Del. 1980).

developments thereafter which could not have been known in the exercise of reasonable diligence at the time of filing.[32]

Plaintiff based the allegations in the Amended Complaint largely on the Fund's own press releases, none of which explained how Cannella, Calhoun, Ricciardi, and Hoysradt satisfied the Qualification Bylaw. Indeed, when pressed at oral argument, defendants could not identify any public information that was available when the Amended Complaint was filed that explained whether (much less how) the Board had determined that those individuals satisfied the Qualification Bylaw.[33]

Third, and more substantively, the Amended Complaint pled sufficient provable facts in my view to establish that plaintiff had at least a reasonable hope of succeeding on Count III when the Amended Complaint was filed. As discussed below, this is due in significant part to the fact that, although the Qualification Bylaw is very specific in certain respects, it uses undefined terms that are vague and susceptible to multiple interpretations. Consider, for example, plaintiff's allegations concerning Cannella, who defendants contend satisfied subsection 2(a)(3) of the Qualification Bylaw. In relevant part, that provision states:

> "Relevant Experience and Country Knowledge" means experience in
> business, investment and economic matters in Europe, the United

---

[32] *Id.*

[33] *See* Tr. 55-61 (Mar. 13, 2018).

12

States, or Switzerland or political matters of Switzerland through service:

> (a) for at least 5 years in one or more of the following principal occupations:

* * * * *

> (3) senior executive officer, including senior legal officer, or partner of an investment management business having at least the equivalent of US $500 million under discretionary management for others in securities of European companies or securities principally traded in Europe . . .[34]

With respect to Cannella, the Amended Complaint summarized the Fund's press release describing her background when she was nominated to the Board as follows:

> Ms. Cannella was described in a press release as an adjunct professor at Columbia Business School; on the Board of Advance Pierre Foods, Watford Reinsurance, and the Schroder family of mutual funds; a retired Managing Director and Head of Global Credit Research and Head of North American Equity and Credit Research from JP Morgan.[35]

---

[34] Am. Compl. Ex. B. Art. II. § 2.

[35] Am. Compl. ¶ 27. The Berris affidavit also references Cannella's experience as a managing director at Citicorp. Berris Aff. ¶ 9. This experience was not disclosed in the Fund's press release (*see* Berris Aff. Ex. B at 1-2) and does not change the analysis concerning Cannella's satisfaction of subsection 2(a)(3) in any event. As discussed below, it is simply not clear that a managing director would constitute a "senior executive officer" as that term is used in the Qualification Bylaw.

The only qualification in this description conceivably relevant to subsection 2(a)(3) is Cannella's experience at JP Morgan.[36] But one cannot determine if this experience would satisfy subsection 2(a)(3) because that provision uses two terms (*i.e.*, "senior executive officer" and "investment management business") that are undefined and open to multiple interpretations.

In my view, JP Morgan fits more naturally within the term "financial business" that is used in subsections 2(a)(1) and 2(a)(2) as opposed to an "investment management business" as used in subsection 2(a)(3). Even assuming for the sake of argument that the terms "financial business" and "investment management business" were intended not to be mutually exclusive (a debatable assumption)[37] but were intended to overlap such that JP Morgan could be both, the undefined term "senior executive officer" is vague and ambiguous.

---

[36] Am. Compl. ¶ 27.

[37] Subsections 2(a)(1) and 2(a)(2) require a nominee who is a senior executive officer of a "financial or industrial business" to have responsibilities that "include or included supervision of European business operations." One reasonable interpretation of subsection 2(a)(3) is that this provision was intended to require similar country knowledge as required under subsections 2(a)(1) and 2(a)(2). This interpretation is supported by subsection 2(a)(4), which suggests that persons satisfying any of the first three subsections were to have such responsibilities. *See* Am. Comp. Ex. B Art. II. § 2(a)(4) (". . . one of whose principal responsibilities includes or included providing services involving European matters or clients for financial or industrial businesses or investment businesses as described in (1) – (3) above"). In that case, it would stand to reason that, to satisfy subsection 2(a)(3), the nominee had to be a senior executive officer of a business *specifically or directly* managing investments for others in European securities, *i.e.*, a business that has "at least the equivalent of US $500 million under

14

For example, the term "*senior executive* officer" reasonably could be construed to mean the five most highly compensated executives (*i.e.*, those disclosed in its public filings with the Securities and Exchange Commission) of a corporation, in which case Cannella undoubtedly would not have satisfied subsection 2(a)(3). On the other hand, the term also reasonably could be construed to encompass a broader group of officers. The problem is that the term "officer" itself is susceptible to numerous interpretations. It is impossible to know without more information whether or not a "managing director" or the "head" of a research department at a firm like JP Morgan constitutes an "officer," much less whether such a person falls within the ambit of the term "senior executive officer" as used in the Qualification Bylaw.[38] Simply put, the use of the term "senior executive officer" in the Qualification Bylaw made the provision inherently ambiguous and left enormous interpretative discretion to the Fund's Board in its application.

Given the lack of objective clarity in key terms of the Qualification Bylaw, the Amended Complaint pled in my opinion, as the allegations concerning

---

discretionary management for others in securities of European companies or securities principally traded in Europe."

[38] *See, e.g. Aleynikov v. The Goldman Sachs Gp., Inc.*, 2016 WL 3763246, at \*4-8 (Del. Ch. July 13, 2016), *aff'd*, 155 A.3d 370 (Del. 2017) (discussing various methods of defining the term "officer" and holding that a Vice President in the Equities Division of Goldman, Sachs & Co. failed to prove that he was an officer of that entity and was not entitled to advancement).

Cannella show, sufficient provable facts to demonstrate that plaintiff had a reasonable hope of succeeding on its claim that the Fund had not applied the Qualification Bylaw uniformly and was attempting to frustrate in an inequitable manner plaintiff's ability to run a proxy contest. Accordingly, with respect to Count III of the Amended Complaint, plaintiff has satisfied the meritorious when filed requirement for obtaining an award under the corporate benefit doctrine.

### B.     This Action Conferred a Corporate Benefit

Plaintiff's application identifies two potential corporate benefits its litigation caused: (1) vindicating the franchise rights of the Fund's stockholders and (2) effectively preventing the Board from using the Qualification Bylaw to preclude future stockholder nominees.

With respect to the first benefit, defendants argue that plaintiff is not entitled to a fee because its "principal motivation was to benefit itself by gaining control of the Board."[39] A similar argument was made and rejected in *EMAK Worldwide, Inc. v. Kurz.*[40] In that case, plaintiffs ran a dissident slate in a proxy contest and later sought a fee award under the corporate benefit doctrine for vindicating the stockholders' franchise rights. This court rejected the argument that plaintiffs were

---

[39] Defs.' Opp'n Br. at 17.

[40] *Kurz v. Holbrook*, C.A. No. 5019, at 17-18 (Del. Ch. July 19, 2010) (TRANSCRIPT), *aff'd sub nom. EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429 (Del. 2012).

not entitled to a fee award on the theory that they "initiated [the] litigation purely for personal reasons and did not provide any benefit to EMAK and all of its stockholders."[41]   Our Supreme Court affirmed, explaining that "[p]reserving shareholder voting rights produces a fundamental corporate benefit."[42]   Based on the reasoning adopted in *EMAK*, I find that plaintiff here similarly conferred a corporate benefit by enabling the Fund's stockholders to vote for and ultimately elect Dakos to the Board despite the Fund's initial opposition.

Defendants did not address in their brief the second alleged benefit, *i.e.*, that this litigation effectively nullified the country knowledge requirement of the Qualification Bylaw.  The existence of this benefit is borne out by the fact that Swiss Helvetia amended its bylaws to eliminate that requirement shortly after seating Dakos as a director of the Fund.  This benefit has value because it prevents the Board from using provisions of the Qualification Bylaw that were ambiguous (as discussed above) as a means to deter or preclude future stockholder nominees.

---

[41] EMAK's Opp'n Br. at 24 (C.A. No. 5019, Dkt. 250); *Kurz*, C.A. No. 5019, at 21-22, 26-27.

[42] *EMAK*, 50 A.3d at 433.

### C.     Amount of the Fee Award

Plaintiff seeks a fee award of $400,000, which defendants contend is a "windfall."[43]     This court relies on the *Sugarland* factors to determine the appropriate size of a fee award.  They are:

> (i) the amount of time and effort applied to the case by counsel for the plaintiffs; (ii) the relative complexities of the litigation; (iii) the standing and ability of the petition counsel; (iv) the contingent nature of the litigation; (v) the stage at which the litigation ended; (vi) whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof; and (vii) the size of the benefit conferred.[44]

"The size of the benefit conferred and the portion of this benefit attributable to plaintiffs are often considered the two most important elements, while the time expended by counsel is considered as a cross-check to guard against windfalls, particularly in therapeutic benefit cases."[45]

On one side of the ledger, this litigation produced the corporate benefits discussed above, which are valuable in my opinion although the value is difficult to quantify.  Additionally, the standing and ability of counsel are not questioned, and counsel handled this case on an entirely contingent basis.

---

[43] Defs.' Opp'n Br. at 3.

[44] *In re Plains Res. Inc. S'holders Litig.*, 2005 WL 332811, at *3 (Del. Ch. Feb 4, 2005) (citing *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149 (Del. 1980)).

[45] *In re Quest Software, Inc. S'holders Litig.*, 2013 WL 5978900, at *6 (Del. Ch. Nov. 12, 2013).

On the other side of the ledger, counsel's litigation efforts were modest. Their most significant work involved preparing a viable complaint and briefing and arguing a contested motion to expedite. Plaintiff's counsel did not take any depositions or engage in document discovery, and the litigation spanned a mere four months from its initiation. This case, the core of which emanated from well-established precedent, also did not involve any particularly complex legal issues.

Taking into account all of these factors, the court awards plaintiff $300,000 in attorneys' fees and expenses. As a cross-check, counsel's expenditure of 204.35 attorney hours (net of approximately $3,830 in expenses) equates to an hourly rate of approximately $1,449, which is in line with the most analogous precedent.[46]

\* \* \* \* \*

For the reasons explained above, the motion for an award of attorneys' fees and expenses is granted. The parties are directed to confer and submit a form of order in accordance with this ruling within five business days.

Sincerely,

*/s/ Andre G. Bouchard*

Chancellor

AGB/gm

---

[46] *Kurz*, C.A. No. 5019, at 3, 31 (granting a fee award equating to an hourly rate of $1,575 in a corporate benefit case vindicating stockholders' franchise rights).

19