**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

July 14, 2025

Matthew D. Perri, Esquire
Daniel E. Kaprow, Esquire
Elizabeth J. Freud, Esquire
Rae Ra, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801

John L. Reed, Esquire
Ronald N. Brown, III, Esquire
DLA Piper LLC (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801

RE: *ARC Global Investments II LLC v. Digital World Acquisition Corp. et al.*, C.A. No. 2024-0186-LWW

Dear Counsel:

Plaintiff ARC Global Investments II LLC sued to resolve a dispute over the proper conversion ratio of its stock in connection with a de-SPAC merger. After trial, I found that the proper conversion ratio was more favorable to ARC than that originally proposed. Now, ARC requests a $1 million fee award under the corporate benefit doctrine.

ARC touts several purported corporate benefits. Most significantly, it asserts that without this suit, the $6 billion business combination of Digital World Acquisition Corp. ("DWAC") and Trump Media & Technology Group Corp. ("TMTG") might have been jeopardized. But most of the claimed benefits are either

unattributable to ARC or yielded no benefit to DWAC. ARC is only entitled to a $75,000 mootness fee for supplemental disclosures that its suit prompted. Its fee request is otherwise denied.

## I.      RELEVANT FACTS

My September 16, 2024 post-trial memorandum opinion details the factual background.[1] A summary follows to provide context for my analysis of ARC's fee request.

### A.      The Conversion Ratio

ARC was the sponsor of DWAC—a Delaware corporation formed as a special purpose acquisition company (SPAC).[2] In early 2021, ARC purchased founder shares of DWAC Class B common stock before DWAC's initial public offering.[3] The founder shares would comprise 20% of DWAC's post-IPO outstanding shares.[4]

DWAC's operative certificate of incorporation at the time of the de-SPAC merger (the "Charter") required DWAC to convert Class B common stock into Class

---

[1] *ARC Glob. Invs. II, LLC v. Digit. World Acq. Corp.*, 2024 WL 4212709 (Del. Ch. Sept. 16, 2024) ("Mem. Op."); *see* Dkt. 205.

[2] Mem. Op. *2.

[3] *Id.*

[4] *Id.*

A common stock at a minimum ratio of 1:1 upon the closing of a business combination.[5] But if DWAC issued more shares of Class A stock than those sold in the IPO, an alternative formula would apply. Under that formula, Class B stockholders would essentially receive one Class A share for every four Class A shares otherwise issued or issuable (subject to specified exclusions) to limit dilution.[6]

### B. The Business Combination

In October 2021, DWAC entered into a merger agreement with legacy TMTG.[7] The agreement provided that TMTG stockholders would receive shares of DWAC Class A common stock upon closing.[8]

The planned business combination stalled for some time before it was renewed in early 2024.[9] As closing neared, DWAC and ARC began to engage on the conversion ratio for the Class B shares.

---

[5] *Id.*

[6] *Id.* at *2-3.

[7] *Id.* at *3.

[8] *Id.*

[9] *Id.* at *3-4.

The parties agreed that the alternative conversion ratio formula had been triggered by certain of DWAC's post-IPO security issuances.[10] But they disagreed on which issuances should be included in the formula's numerator. ARC initially insisted that the correct conversion ratio was 1.58:1, which it later increased to 1.69:1.[11] DWAC estimated a ratio of 1.34:1.[12]

### C. The Proxy and This Litigation

On February 16, 2024, DWAC filed a proxy statement and prospectus (the "Proxy") with the Securities and Exchange Commission.[13] The Proxy told DWAC stockholders about an upcoming meeting to approve the TMTG business combination.[14] It also disclosed an anticipated Class B/Class A conversion ratio of 1.34:1, ARC's higher proposed ratio, and that the final conversion ratio was yet to be determined.[15]

---

[10] *See id.* at *4 (describing the security issuances).

[11] *Id.* at *5. In its initial filing of the present litigation, ARC again raised its proposed ratio to 1.78:1. *Id.* at *6.

[12] *Id.* at *5.

[13] *See* ARC Global Invs. II LLC's Mot. for a Fee Award (Dkt. 208) ("Mot.") Ex. B ("Proxy").

[14] Mem. Op. *5.

[15] *Id.* at *5-6.

ARC filed this lawsuit on February 28.[16]  It advanced claims for breach of the

Charter, for declaratory relief regarding the proper conversion ratio, and for breach

of fiduciary duty based on alleged misstatements in the Proxy.[17]  DWAC issued a

Form 8-K on March 1 that mooted ARC's disclosure claim.[18]  On March 8, the

parties agreed that if they "appl[ied] a conversion ratio applicable to DWAC Class

B common stock that [wa]s greater or less than 1.34:1, [DWAC would] escrow

shares equal to the difference between such conversion ratio and a conversion of

DWAC Class B common stock shares at a ratio of 2:1."[19]

The business combination closed as planned on March 25.[20]

## D.     Procedural History

A one-day trial was held on July 29, 2024.[21]  After trial, I calculated a 1.4911:1

conversion ratio—resulting in 4,095,125 more shares accruing to ARC than under

---

[16] Verified Compl. for Specific Performance, Declaratory J., and Breach of Fiduciary Duty (Dkt. 1) ("Compl.").  ARC filed an amended complaint on June 6.  Dkt. 91.

[17] Compl. ¶¶ 42-58.

[18] *See infra* note 57 and accompanying text.

[19] Stip. and [Proposed] Order Regarding Mot. to Expedite (Dkt. 24) ¶ 2; *see infra* note 46 and accompanying text.

[20] Mem. Op. *6, 13.

[21] Dkts. 198, 204.

DWAC's proposed 1:34 ratio.[22]  In reaching that figure, I sided with ARC on three of the six categories of disputed securities.[23]  I entered an order implementing that decision on September 17.[24]

On October 23, ARC moved for a fee award.[25]  DWAC opposed ARC's motion on December 4.[26]  On January 8, 2025, ARC filed a reply in further support of its motion.[27]  Although oral argument on the motion was set for April 29, I determined that it was unnecessary and took the motion under advisement as of April 25.[28]

## II.  ANALYSIS

Delaware follows the American Rule that parties to litigation are generally responsible for paying their own attorneys' fees.[29]  "Delaware courts have been very cautious in granting exceptions to th[is] rule."[30]  One such exception is the corporate benefit doctrine, which "allows a litigant to recover fees and expenses from a

---

[22] Mem. Op. *13.

[23] *Id.*

[24] Dkt. 206.

[25] Dkt. 208.

[26] Def. DWAC's Response in Opp'n to ARC's Mot. for a Fee Award (Dkt. 213) ("Opp'n").

[27] Pl.'s Reply in Further Supp. of Mot. for a Fee Award (Dkt. 220) ("Reply").

[28] Dkt. 222.

[29] *See Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1164 (Del. 1989).

[30] *CM&M Grp., Inc. v. Carroll*, 453 A.2d 788, 795 (Del. 1982).

corporation" where the lawsuit conferred a non-monetary "valuable benefit upon the corporate enterprise or its shareholders."[31]  The doctrine exists to "prevent 'persons who obtain the benefit of a lawsuit without contributing to its cost [from being] unjustly enriched at the successful litigant's expense.'"[32]

The party invoking the doctrine must show that "(a) the claim was meritorious when filed; (b) the action was benefitting the corporation . . . ; and (c) the benefit was causally related to the lawsuit."[33]  It also bears the burden of proving that the fee sought is reasonable under the *Sugarland* factors.[34]  "[T]he Court of Chancery

---

[31] *Dover Hist. Soc'y, Inc. v. City of Dover Plan. Comm'n*, 902 A.2d 1084, 1090 (Del. 2006).

[32] *Id.* (citing *Goodrich v. E.F. Hutton Grp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996)).

[33] *Tandycrafts*, 562 A.2d at 1167; *see also Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980) (applying this test in the mootness context).

[34] *See Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149 (Del. 1980) (considering the following factors: "the amount of time and effort applied to a case by counsel for plaintiff, the relative complexities of the litigation, the skills applied to their resolution by counsel, as well as any contingency factor and the standing"); *see also, e.g.*, *In re Am. Real Est. P'rs, L.P. Litig.*, 1997 WL 770718, at *6 (Del. Ch. Dec. 3, 1997) (evaluating the reasonableness of attorneys' fees using the *Sugarland* factors).

must make an independent determination of reasonableness on behalf of the [suit's] beneficiaries, before making or approving an attorney[s'] fee award."[35]

ARC contends that its lawsuit resulted in three distinct corporate benefits. First, it purportedly "caused the closing of the business combination and protected the stockholder franchise."[36] Second, it obtained an order to "escrow disputed shares and protect Class B stockholder standing."[37] And third, it caused DWAC to issue supplemental disclosures about the conversion ratio.[38]

The first and second matters cannot support a fee award. No benefit to DWAC was conveyed and any causal link to this suit is lacking. The third matter, however, supports a mootness fee of $75,000.

### A. Closing of the Business Combination

ARC asserts that without its lawsuit, "the [b]usiness [c]ombination could not have properly closed."[39] It says that this action "preserved the ability of Class B stockholders to vote in accordance with their contractual rights, thereby protecting

---

[35] *Goodrich*, 681 A.2d at 1046.

[36] Mot. 7 (capitalization removed); *id.* ¶¶ 19-23.

[37] *Id.* ¶ 30.

[38] *Id.* ¶ 24; *see also id.* ¶ 30.

[39] *Id.* ¶ 19.

the stockholder franchise, and secur[ing] the benefit of a multi-billion-dollar [b]usiness [c]ombination."[40] That is, ARC believes that the Class B stockholders—including ARC—would have refused to vote for the business combination absent the conversion ratio modifications it secured.[41]

There are several flaws with ARC's argument. ARC did not cause the business combination. Nor is it apparent that the business combination could not close absent this litigation. According to DWAC, ARC contractually agreed to vote for any business combination.[42] DWAC's high trading price on the eve of closing also made it economically rational for ARC to support the deal.[43] These facts aside, ARC's argument fails for a more fundamental reason: any corporate benefit was secondary to the benefit ARC secured for itself.

---

[40] *Id.* ¶ 19.

[41] *See id.* ¶¶ 20-21; *id.* ¶ 22 ("Absent this litigation, Class B stockholders were faced with an untenable choice: vote in favor of the transaction and hope that they received any Class A shares or withhold their vote[,] thereby preventing the [b]usiness [c]ombination from closing and risk the loss of all value.").

[42] Opp'n ¶ 14; *see* Opp'n Ex. A (September 2, 2021 Agreement) 1; Mot. Ex. I.

[43] *See* Opp'n ¶ 14; Yahoo! Finance, Trump Media & Technology Group Corp. (DJT), https://finance.yahoo.com/quote/DJT/history/?period1=1710979200&period2=17118432 00 (last visited July 12, 2025) (showing a closing stock price of $44.70 as of March 21, 2024, the day before stockholders approved the transaction); *see also Lee v. Pincus*, 2014 WL 6066108, at *4 n.11 (Del. Ch. Nov. 14, 2014) (explaining that the court may take judicial notice of stock prices "because they are not subject to reasonable dispute").

The benefit of this litigation flowed to DWAC's Class B stockholders—principally ARC, which obtained a greater number of Class A shares than it would have otherwise received. Any benefit to DWAC and its stockholders, such as the enforcement of the Charter, was incidental to ARC's main goal of obtaining a favorable conversion ratio. Because ARC set out primarily to benefit itself, a fee award related to the closing of the business combination is unwarranted.[44]

### B. Escrow of the Disputed Shares

The Class A shares that DWAC's Class B stockholders would receive at closing were subject to a contractual lock-up through mid-September 2024.[45] Still, pending my judgment on the correct conversion ratio, DWAC agreed to place in escrow the difference between the shares to be received under DWAC's estimated

---

[44] *See, e.g.*, *Keyser v. Curtis*, 2012 WL 3115453, at *19 (Del. Ch. July 31, 2012) (rejecting a fee request under the corporate benefit doctrine where the "principal beneficiaries of the action [we]re the [p]laintiffs" and any benefit to other stockholders was slight), *aff'd sub nom. Poliak v. Keyser*, 65 A.3d 617 (Del. 2013); *Martin v. Harbor Diversified, Inc.*, 2020 WL 568971, at *4 (Del. Ch. Feb. 5, 2020) ("[I]t would be inequitable to grant fees to the [p]laintiff where it is clear that the corporate benefit was a mere externality to the [p]laintiff's ultimate goal"), *aff'd*, 244 A.3d 682 (Del. 2020); *TS Falcon I, LLC v. Golden Mountain Fin. Hldgs. Corp.*, 2024 WL 3942255, at *10 (Del. Ch. Aug. 27, 2024) (declining to award the plaintiff fees under the corporate benefit doctrine where the "main beneficiary of th[e] action" was the plaintiff).

[45] Mem. Op. *7.

1.34:1 ratio and those to be received under a 2:1 ratio.[46]  I denied ARC's request to delay the vote on the business combination.[47]

ARC claims that it is entitled to a fee award for causing DWAC to "escrow disputed shares and protect Class B stockholder standing."[48]  But even if the escrow yielded such benefits,[49] they inured only to the Class B stockholders—not to DWAC or its Class A stockholders.  The corporate benefit doctrine is inapt in these circumstances.[50]

---

[46] *Id.* at *6-7; Dkt. 28 ¶ 1; *see also* Mot. Ex. J (escrow agreement).

[47] Tr. of Mar. 5, 2024 Telephonic Oral Arg. and Rulings of the Ct. on Pl.'s Mot. to Expedite (Dkt. 113) ("Mot. to Expedite Hr'g Tr.") 50, 53-54.

[48] Mot ¶ 30.  DWAC argues that ARC "created, at most, a common fund of Class B shares" through this litigation.  Opp'n 1; *see id.* ¶¶ 11 n.1, 15.  ARC, however, disclaims any request for fees under the common fund doctrine.  *See* Mot. ¶ 36 n.3.

[49] DWAC asserts that "[e]scrowing the shares did not protect the stockholders' standing because the shares were subject to a lock-up agreement and could not be transferred until September 19, 2024, at the earliest, meaning the escrow did not materially alter ARC's position post-merger."  Opp'n ¶ 18.  It also notes that since ARC was contractually obligated to approve the merger (*see supra* note 42 and accompanying text), the escrow had no effect on the stockholder vote.  Opp'n ¶ 19.  This first point is inconsistent with the memorandum opinion.  *See* Mem. Op. *6 n.73.  But because I reject ARC's fee request for other reasons, I need not resolve the merits of DWAC's argument.

[50] *See supra* note 44 and accompanying text.

C.    **Supplemental Disclosures**

The third purported benefit ARC cites is the supplemental disclosures in DWAC's Form 8-K.[51]  ARC initially claimed that the Proxy's descriptions of the conversion ratio were materially false and misleading.  It challenged statements in the Proxy including that DWAC "expect[ed] the conversion ratio rate to be 1.34" and that DWAC's Board might "decide to exclude" certain financings from calculating the conversion ratio or "find a different, lower conversion ratio to be acceptable at the time of the [c]losing."[52]  ARC also questioned the Proxy's assertion that DWAC "ha[d] not been able to confirm the basis" for ARC's "different conversion ratio" since the Charter outlined the applicable formula.[53]

Taking these allegations together, it is reasonably conceivable that the Proxy put forward an incorrect conversion ratio and left DWAC's stockholders with uncertainty around the consideration they would receive in the merger.  It is also reasonably conceivable that the ratio at which Class B common stock would be converted into Class A shares, and the dilutive effect of that conversion, would have

---

[51] Mot. ¶ 24.

[52] Compl. ¶ 36 (quoting Proxy 96-97).

[53] *Id.* ¶ 37 (quoting Proxy 97).

been material to a reasonable DWAC stockholder deciding how to vote.[54]  As such,

ARC's disclosure claim was "meritorious when filed."[55]

The supplemental disclosures issued by DWAC on March 1, 2024 were

designed to moot ARC's claim and filed before ARC "obtained a judicial

resolution."[56]  DWAC's Form 8-K disclosed ARC's contention that a 1.78:1

conversion ratio applied.[57]  It also included a table showing the percentage

ownership of public stockholders in the combined entity under different conversion

ratios: 1:1, 1.34:1, and 1.78:1; and assuming 0%, 33.33%, 50%, and 77% redemption

---

[54] *See Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (explaining that an omitted fact is material "if there is a substantial likelihood that a reasonable [stockholder] would consider it important in deciding how to vote" (citation omitted)); *Goldman v. Pogo.com*, 2002 WL 1358760, at *10 (Del. Ch. June 14, 2002) (holding that the defendants failed to disclose material information where a plaintiff claimed he was "not fairly apprised of the extent to which his equity position in the [c]ompany would likely be diluted" by a transaction); *see also* Reply 7 n.3 ("[T]he disclosures concerned the value of consideration to be received by stockholders in a merger requiring stockholder approval.").

[55] *Anderson v. Magellan Health, Inc.*, 298 A.3d 734, 747 (Del. Ch. 2023) (explaining that "meritorious when filed" means that a plaintiff's claim "meet[s] the pleading standard of Rule 12(b)(6)"); *see also Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1966) ("A claim is meritorious within the meaning of the rule if it can withstand a motion to dismiss on the pleadings if, at the same time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success.").

[56] *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 432 (Del. 2012); *see* Def.'s Corrected Opp'n to Pl.'s Mot. to Expedite (Dkt. 12) 3, 7-10 (explaining that the additional disclosures were "sufficient to enable an informed vote").

[57] Mot. Ex. F ("DWAC Mar. 1 Form 8-K") 3; *see also* Mem. Op. *6.

by the public stockholders.[58]  It explained that "[o]n February 26, 2024, ARC, through its representatives, asserted that—after a 'more thorough review'—the conversion ratio . . . was 'approximately 1.8:1' . . . ."[59]  These disclosures gave stockholders important information about the potential conversion ratios the parties advanced, which allowed stockholders to contextualize what those ratios could mean for their ownership in the combined company.[60]

Because ARC is entitled to a mootness fee, I must "make an independent determination of reasonableness" of the amount.[61]  The *Sugarland* factors guide this analysis, including: (1) the results achieved; (2) whether counsel was working on a contingent basis; (3) the time and effort of counsel; and (4) counsel's standing and ability.[62]  Delaware courts generally assign "the greatest weight to the benefit achieved in litigation."[63]

---

[58] DWAC Mar. 1 Form 8-K at 3.

[59] *Id.* at 2.

[60] DWAC contends that ARC conceded the supplemental disclosures were "merely 'incrementally helpful.'"  Opp'n ¶ 17 (quoting Mot. ¶ 24).  That takes ARC's statement out of context.  ARC said that the "supplemental disclosures were incrementally helpful *with respect to saving the transaction.*"  Mot. ¶ 24 (emphasis added).

[61] *See supra* note 35 and accompanying text.

[62] *Sugarland*, 420 A.2d at 149; *see also supra* note 34.

[63] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012).

"In sizing the value of a disclosure benefit, the court looks to comparable cases."[64] Delaware courts have recognized an "effective upper bound" of $450,000 for "negotiated, material disclosures."[65] That is the exception—not the norm. More often, mootness fees for conceivably material disclosures fall within a range of $75,000 to $100,000.[66]

Vice Chancellor Slights' decision in *Rodden v. Bilodeau* provides a useful benchmark.[67] There, he held it was "reasonably conceivable" that the amount of compensation a financial advisor received from the company and its counterparty for unrelated engagements would be "deemed material" since it would help stockholders "contextualize the magnitude" of the financial advisor's "potential

---

[64] *Assad v. Botha*, 2023 WL 7121419, at *8 (Del. Ch. Oct. 30, 2023); *see also In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1136 (Del. Ch. 2011) ("A court can readily look to fee awards granted for similar disclosures in other transactions because enhanced disclosure is an intangible, non-quantifiable benefit.").

[65] *Magellan*, 298 A.3d at 750; *see also Bednar v. Cleveland Biolabs, Inc.*, 2023 WL 3995121, at *5 (Del. Ch. June 13, 2023) (ORDER) (describing a fee award of $450,000 as at the "high end" of the negotiated "going rate" for a set of material disclosures after *Trulia* (citing *In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884 (Del. Ch. 2016))).

[66] *See, e.g.*, *Rodden v. Bilodeau*, C.A. No. 2019-0176-JRS, at 21 (Del. Ch. Jan. 27, 2020) (TRANSCRIPT) (awarding a $75,000 mootness fee for supplemental disclosures); *Botha*, 2023 WL 7121419, at *9 (awarding a mootness fee of $100,000 for limited, material supplemental disclosures); *see also Magellan*, 298 A.3d at 751 (awarding $75,000 for "helpful" supplemental disclosures).

[67] *Rodden*, C.A. No. 2019-0176-JRS, at 21.

conflict[s] of interest."[68]  The information disclosed by DWAC similarly provides

important context.  But the subject matter is not just an advisor's potential conflict.

Instead, it concerns the very consideration that stockholders stood to gain in the

merger, which arguably supports a higher mootness fee than the $75,000 awarded in

*Rodden*.[69]

Yet the remaining *Sugarland* factors tilt slightly negatively against the total

value of the fee award.  ARC's counsel did not work on a contingent basis.[70]  I have

no doubt as to counsel's standing and ability.  And they spent significant time on the

litigation as a whole—eventually succeeding on some of their claims after a trial.

But for the purposes of this fee award, I must focus on the time counsel spent

obtaining the specific corporate benefit for which the fee was earned.[71]  The relevant

---

[68] *Id.* at 21.

[69] *See Botha*, 2023 WL 7121419, at *9 (concluding that an award $25,000 higher than that in *Rodden* was warranted).

[70] Rule 88 Aff. of Matthew D. Perri, Esq. (Dkt. 208) ¶ 8; *see Dow Jones & Co. v. Shields*, 1992 WL 44907, at *2 (Del. Ch. Jan. 10, 1992) (describing contingency as the "second most important factor considered by the Court in awarding the counsel fee").

[71] *See In re BEA Sys., Inc. S'holders Litig.*, 2009 WL 1931641, at *1 (Del. Ch. June 24, 2009) (haircutting fees awarded to account for time "spent on aspects of the litigation that produced no benefit"); *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 178, 185 (Del. Ch. 2003) ("Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983))).

mooting disclosure was issued on March 1, 2024, at which point ARC's attorneys had spent limited time on the matter.[72]  Taken together, these factors suggest that the fee award should be adjusted downward to $75,000.

## III.    CONCLUSION

For the reasons above, ARC is awarded a $75,000 mootness fee.  The parties are directed to file a proposed form of implementing order within 14 days.

Sincerely yours,

/s/ *Lori W. Will*

Lori W. Will
Vice Chancellor

cc:    Kevin M. Coen, Esquire
Jacob Perrone, Esquire
Sarah Andrade, Esquire

---

[72] ARC does not provide an exact total of the hours spent before March 1, but notes that its counsel "expended 300.3 hours on this dispute through the date the standing order was entered" on March 18.  Mot. ¶ 38; *see id.* ¶ 12 (providing the date of the standing order). The hours expended serves primarily "as a crosscheck to guard against windfall awards." *In re Dell Techs. Inc. Class V S'holders Litig.*, 300 A.3d 679, 692 (Del. Ch. 2023), *aff'd*, 2024 WL 3811075 (Del. Aug. 14, 2024); *see also Sauer-Danfoss*, 65 A.3d at 1136.  The most pertinent consideration here is that the number of hours dedicated to the disclosure claim was significantly less than that expended toward the litigation as a whole.