EMAK WORLDWIDE, INC., Defendant Below Appellant,

v.

Donald A. KURZ and Sems Diversified Value, LP,[1] Plaintiffs Below Appellees,

and

Bouchard Margules & Friedlander, P.A., Appellee.

No. 512, 2011.

Supreme Court of Delaware.

Submitted: March 14, 2012.
Decided: April 17, 2012.

---

1. Even though appellees are named parties, they did not participate in the proceedings.

Kenneth J. Nachbar (argued) and Shannon E. German, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware for appellant EMAK Worldwide, Inc.

Andre G. Bouchard and Joel Friedlander (argued), Bouchard Margules & Friedlander, P.A., Wilmington, Delaware for appellee Bouchard Margules & Friedlander, P.A.

Before STEELE, Chief Justice, HOLLAND and RIDGELY, Justices.

STEELE, Chief Justice:

Delaware law rewards plaintiffs' attorneys who provide a benefit to a Delaware corporation, even if the benefit does not produce immediate monetary rewards. Preserving shareholder voting rights, for example, produces a non-monetary benefit. The Vice Chancellor made an interim fee award of $2.5 million to plaintiff's attorneys, after the Court of Chancery's decision in *Kurz v. Holbrook*[2] and our decision in *Crown EMAK Partners, LLC v. Kurz.*[3] The record supports the Vice Chancellor's factual finding that the voting rights preserved by the litigation were meaningful, and we decline the invitation to fine tune the amount he awarded. We **AFFIRM** the judgment of the Court of Chancery.

## I. FACTS AND PROCEDURAL HISTORY

The common and preferred shareholders of EMAK Worldwide, Inc. had a long, back-and-forth control dispute. The largest common shareholder, Donald Kurz, held 1,420,272 of EMAK's 7,034,322 shares. Kurz also served as EMAK's longtime CEO. In 2005, James L. Holbrook, Jr. succeeded Kurz as EMAK's CEO. During the first three and a half years of Holbrook's tenure, EMAK's stock went from trading on NASDAQ at $11 to trading on the pink sheets at $0.21.

Crown EMAK Partners, LLC held all of EMAK's preferred shares. The preferred shares could not vote in directors' elections, but they could (1) unilaterally appoint two directors; (2) be converted into 2,777,777 common shares; and (3) vote on an as-converted basis in all other matters, carrying 27.6% of EMAK's total voting power. In addition, the preferred shares had a $25 million liquidation preference. EMAK's bylaws, not its charter, fixed the board's size at seven directors.

Kurz began attempting to take back control of EMAK in mid–2008. In April 2009, Kurz wrote to the board and threatened to remove the common shareholder representatives and take legal action. In December 2008, Crown's controller, Peter

---

**2.** 989 A.2d 140 (Del.Ch.2010).

**3.** 992 A.2d 377 (Del.2010).

Ackerman, attended an EMAK board meeting and demanded par redemption of Crown's preferred shares. Throughout 2009, Crown threatened legal action. The Vice Chancellor observed that Holbrook was trapped between Kurz and Crown, he considered Crown his benefactor, and after August 2009, he sided with Crown.[4]

In 2009, EMAK and Crown negotiated for Crown to exchange its old preferred shares with new preferred shares with no right to appoint unilaterally two directors, but could vote on an as-converted basis on all matters, including directors' elections (Exchange Transaction). Kurz filed a complaint on October 26, 2009, seeking to enjoin and rescind the Exchange Transaction. Kurz began a proxy contest in late 2009 (Kurz Consent). The Vice Chancellor scheduled a preliminary injunction hearing for December 4, 2009. EMAK solicited consents to ratify the Exchange Transaction (Ratification Consent), but on December 3, EMAK and Crown rescinded it, mooting Kurz's claim.

Kurz filed an amended complaint challenging, *inter alia*, EMAK's Ratification Consent disclosures, and the litigation proceeded on these and other claims, counterclaims, and third-party complaints. On December 4, the Vice Chancellor unsealed EMAK's record filings, and Kurz asserted that the information in them corrected EMAK's disclosures.

Separately, Crown began soliciting consents to reduce EMAK's board from seven members to three members before the annual meeting (Crown Consent). If the Crown Consent had succeeded, Crown would have controlled EMAK's board be-

cause it could have unilaterally appointed two directors. In his *Kurz* decision, the Vice Chancellor found that the Crown Consent violated the DGCL, and we affirmed, in relevant part. Nevertheless, Crown delivered a second consent to shrink EMAK's board to three members at the annual meeting (New Consent).

After this Court's decision in *Crown*, Kurz's attorneys, Bouchard Margules & Friedlander, P.A., filed an interim fee application. In an oral ruling on July 19, 2010, the Vice Chancellor awarded $1.7 million for rescinding the Exchange Transaction, $400,000 for correcting the Ratification Consent disclosures, and $400,000 for invalidating the Crown Consent. He found that EMAK's rescission of the Exchange Transaction and the judgment against the Crown Consent benefited all EMAK's shareholders by assuring a free election, and that Crown's control was not inevitable:

> .... And the whole idea that this was inevitable, I just don't buy it.

> As somebody who read all the factual record in connection with preparing for a preliminary injunction hearing, ... it certainly wasn't clear to me that when stockholders understood the types of machinations that went on here, that they would inevitably side with the defendants. That's ultimately their choice, but it certainly wasn't clear to me. And I suggest that given the closeness of the result, it probably wasn't clear to anybody.[5]

The Vice Chancellor found that Crown used the Crown Consent because it feared Kurz could win a proxy contest. For ex-

---

4. *Kurz v. Holbrook*, C.A. No. 5019, at 85–88 (Del.Ch. July 19, 2010) (TRANSCRIPT) [hereinafter Award Transcript]; *see* B130–31 ("I am scared of [Kurz] and [Ackerman] and legal action...."), B158, B194 ("What [Ackerman] wants to do is to be able to not let

[Kurz] get control of the board...."), B206, B238 ("Ackerman is now my partner...."), B289.

5. Award Transcript at 93.

ample, one of Crown's director designees, Jeffrey Deutschman, testified that Crown began the Crown Consent after Kurz proposed deferring the litigation until after the Kurz Consent's end date, and EMAK's board noticed that the trading volume of its shares substantially increased.[6] Deutschman stated: "Those two events convinced the Crown side that [Kurz] may be actually able to get the consents."[7] The Vice Chancellor also found that unsealing EMAK's records benefited the corporation because its Ratification Consent disclosures were probably false.[8] He ordered EMAK to pay the total of $2.5 million, inclusive of expenses, within five days of an order, and he made factual findings justifying his order:

.... EMAK has not hesitated to pay its own counsel and Crown's counsel over $5 million to litigate against the plaintiffs. EMAK also has paid significant bonuses to senior management during this corporate control dispute, including to individuals whose loyalty to the corporation has been called into question by the considerable evidentiary record developed by the plaintiffs.[9]

Instead of paying the fee award, EMAK filed a voluntary bankruptcy petition on August 6, 2010. It emerged from bankruptcy on June 30, 2011, with the obligation to pay the award intact, although the plan eliminated the pre-bankruptcy

common shareholders and issued Crown all the common and preferred shares in the reorganized company. On September 20, 2011, the Vice Chancellor made the interim award a final judgment. EMAK appealed.

## II. STANDARD OF REVIEW

We review an attorneys' fee award for abuse of discretion.[10] We do not substitute our own notions of what is right for those of the trial judge if that judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness.[11] We will not set aside or overturn the Court of Chancery's factual findings unless they are clearly wrong and justice requires it, or they are not the product of an orderly and logical deductive process.[12]

## III. ANALYSIS

### A. Preserving Shareholder Voting Rights Produces a Non–Monetary Corporate Benefit

Under the corporate benefit doctrine, plaintiffs may be reimbursed for their fees and expenses if (1) the suit was meritorious when filed, (2) the defendants took an action that produced a corporate benefit before the plaintiffs obtained a judicial resolution, and (3) the suit and the corporate benefit were causally related.[13]

---

6. See Award Transcript at 93; B430.

7. B430.

8. Award Transcript at 96.

9. Kurz v. Holbrook, 2010 WL 3028003, at *3 (Del.Ch. July 29, 2010).

10. William Penn P'ship v. Saliba, 13 A.3d 749, 758 (Del.2011) (citing Mahani v. Edix Media Group, Inc., 935 A.2d 242, 245 (Del.2007)).

11. Id. (citing Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n, 902 A.2d 1084, 1089 (Del.2006)).

12. Amirsaleh v. Bd. of Trade of N.Y., Inc., 27 A.3d 522, 529 (Del.2011) (citing Montgomery Cellular Holding Co. v. Dobler, 880 A.2d 206, 219 (Del.2005)); William Penn, 13 A.3d at 756 (citing Int'l Telecharge, Inc. v. Bomarko, 766 A.2d 437, 438 (Del.2000)).

13. Alaska Elec. Pension Fund v. Brown, 988 A.2d 412, 417 (Del.2010) (citing Allied Artists Pictures Corp. v. Baron, 413 A.2d 876, 878 (Del.1980)).

Under the "mootness rule," [14] when a defendant took an action after the suit was filed that mooted a claim, there is a rebuttable presumption the suit and the benefit were causally related because the defendant is in the best position to know the events, reasons, and decisions behind its action.[15] We have affirmed awards for many kinds of non-monetary benefits, including causing a defendant to abandon a going-private transaction;[16] making corrective disclosures in proxy materials;[17] returning voting rights to common shareholders;[18] and canceling a preferred stock issue to a controlling shareholder that, allegedly, was not entirely fair.[19]

■ Shareholder voting rights are sacrosanct. The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm.[20] Without that right, a shareholder would more closely resemble a creditor than an owner. Shareholders have limited opportunities to exercise their right to vote. When plaintiff's counsel obtains a corporate benefit by protecting shareholder voting rights, the benefit's size does not depend on the corporation's monetary value. The Vice Chancellor correctly found that the *Kurz* and *Crown* litigation produced a corporate benefit by preserving the EMAK shareholders' voting rights.

EMAK argues this Court should limit the Court of Chancery's discretion to make an award because EMAK had very little cash, the award affected its viability, and EMAK's market capitalization was approximately $5 million on the award date. We decline to adopt that position. Preserving shareholder voting rights produces a fundamental corporate benefit. Public policy supports discouraging director and officer manipulation by encouraging plaintiffs to challenge actions that frustrate the shareholder voting franchise.[21] Moreover, EMAK's position, if adopted, would enable improper gamesmanship, allowing directors to dampen opposition by signaling they would sacrifice the corporation's viability by spending all its cash on defense costs. In this case, those fears have particular force because, as the Vice Chancellor found, EMAK paid its defense counsel over $5 million but refused to pay half that to plaintiff's counsel.

**B. The Record Supports the Vice Chancellor's *Sugarland* Analysis**

■ Delaware courts use the factors in *Sugarland Industries, Inc. v. Thomas* to determine an award's amount.[22] The Vice Chancellor made factual findings sup-

---

14. *See McDonnell Douglas Corp. v. Palley*, 310 A.2d 635, 637 (Del.1973) (citing *Rosenthal v. Burry Biscuit Corp.*, 209 A.2d 459 (Del.Ch. 1949)).

15. *Alaska*, 988 A.2d at 417 (citing *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1167 (Del.1989); *Allied Artists*, 413 A.2d at 880).

16. *See Cal–Maine Foods, Inc. v. Pyles*, 858 A.2d 927, 929 (Del.2004).

17. *See Tandycrafts*, 562 A.2d at 1163–64.

18. *See Allied Artists*, 413 A.2d at 878.

19. *See McDonnell Douglas*, 310 A.2d at 636.

20. *See MM Companies, Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118 (Del.2003).

21. *See Liquid Audio*, 813 A.2d at 1131.

22. 420 A.2d 142, 149–53 (Del.1980); *accord Loral Space & Commc'ns, Inc. v. Highland Crusader Offshore Partners, L.P.*, 977 A.2d 867, 870 (Del.2009) ("Under settled law, the trial court should consider: 1) the results achieved; 2) the time and effort of counsel; 3) the complexity of the issues; 4) whether counsel were working on a contingent fee basis; and 5) counsel's standing and ability.").

ported by the record regarding each factor. Plaintiff's counsel produced corporate benefits by preserving voting rights, as well as achieving fuller disclosure and invalidating the Crown Consent. As the Vice Chancellor found, this case presented complex and novel legal issues, made more difficult by the fact that plaintiff's counsel faced five large law firms and a rapidly evolving case. Counsel worked on a contingency basis, and the Vice Chancellor credited counsel's standing and ability.

Finally, he found the benefits were sizeable: "This was a strong challenge brought to a transaction where there was ... real evidence of loyalty breaches; and rescinding the transaction fundamentally changed the corporate governance landscape."[23] The Vice Chancellor analyzed each *Sugarland* factor and the record supports his findings. This Court remains content to leave the challenge of quantifying fee awards to the trial judge in the absence of evidence of capriciousness or factual findings that are clearly wrong.

## C. The Record Supports the Vice Chancellor's Finding that Crown's Control Was Not Inevitable

The Vice Chancellor found Crown's control of EMAK was not inevitable. EMAK argues Crown's control was inevitable, but the question is a factual one. The record supports the Vice Chancellor's finding. For example, the Vice Chancellor referred to Deutschman's testimony and found Crown's worry that Kurz might win the first proxy contest was one reason it began the Crown Consent.[24] Therefore, the Vice Chancellor did not abuse his discretion.

## IV. CONCLUSION

The Court of Chancery correctly found that the *Kurz* and *Crown* litigation pro-

duced a corporate benefit by preserving the EMAK shareholders' voting rights. The record supports the Court's *Sugarland* analysis and its finding that Crown's control was not inevitable. Therefore, the Court of Chancery's judgment is **AFFIRMED.**

---

**23.** Award Transcript at 107. The *Sugarland* analysis spans several pages. *See id.* at 103–08.

