# IN THE SUPREME COURT OF THE STATE OF DELAWARE

SEAN J. GRIFFITH, §
§
 Objector Below, §
 Appellant, §
§
v. §
§
SHIVA STEIN, derivatively on behalf §
 of The Goldman Sachs Group, §
 Inc., and individually as a §
 stockholder of The Goldman §  No. 264, 2021
 Sachs Group, Inc., §
§
 Plaintiff Below, §  Court Below: Court of Chancery
 Appellee, and §  of the State of Delaware
§
LLOYD C. BLANKFEIN, M. §  C.A. No. 2017-0354
MICHELE BURNS, GARY D. §
COHN, MARK A. FLAHERTY, §
WILLIAM W. GEORGE, JAMES A. §
JOHNSON, ELLEN J. KULLMAN, §
LAKSHMI N. MITTAL, ADEBAYO §
O. OGUNLESI, PETER §
OPPENHEIMER, DEBORA L. §
SPAR, MARK E. TUCKER, DAVID §
A. VINIAR, MARK O. §
WINKELMAN, and THE §
GOLDMAN SACHS GROUP, INC. §
§
 Defendants Below, §
 Appellees. §

Submitted:  May 25, 2022
Decided:   August 16, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery: **REVERSED AND REMANDED**.

Anthony A. Rickey, Esquire (*argued*), MARGRAVE LAW LLC, Wilmington Delaware, Raffi Melkonian, Esquire, WRIGHT CLOSE & BARGER, LLP, Houston, Texas, *for Objector Below, Appellant Sean J. Griffith.*

Brian E. Farnan, Esquire, Michael J. Farnan, Esquire, Rosemary J. Piergiovanni, Esquire, FARNAN LLP, Wilmington, Delaware, A. Arnold Gershon, Esquire (*argued*), Michael A. Toomey, Esquire, BARRACK, RODOS & BACINE, New York, New York, *for Plaintiff Below, Appellee Shiva Stein*.

Kevin G. Abrams, Esquire, J. Peter Shindel, Jr., Esquire, Matthew L. Miller, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware, Robert J. Giuffra, Jr., Esquire (*argued*), David M.J. Rein, Esquire, SULLIVAN & CROMWELL LLP, New York, New York, *for Defendants Below, Appellees Lloyd C. Blankein, M. Michele Burns, Gary D. Cohn, Mark A. Flaherty, William W. George, James A. Johnson, Ellen J. Kullman, Lakshmi N. Mittal, Adebayo O. Ogunlesi, Peter Oppenheimer, Debora L. Spar, Mark E. Tucker, David A. Viniar, and Mark O. Winkleman*

Kevin M. Gallagher, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *for Nominal Defendant Below, Appellee The Goldman Sachs Group, Inc*.

**SEITZ**, Chief Justice:

Before us is an objector's appeal from a Court of Chancery decision approving a litigation settlement for claims alleging excessive non-employee director compensation. Initially, the parties agreed to a preliminary settlement and presented it to the Court of Chancery for approval. The Court of Chancery sided with the objector and refused to approve a non-monetary settlement of the derivative claims. The court also awarded the objector fees.

After the court denied a motion to dismiss, the parties returned to the negotiating table and came up with a new settlement that included a financial benefit to the corporation. The objector renewed his objection, this time arguing that the new settlement improperly released future claims challenging compensation awards and that the plaintiff was not an adequate representative for the corporation's interests. The Court of Chancery approved the new settlement and refused to award the objector additional attorneys' fees.

The objector raises three arguments on appeal: the court erred by (1) approving an overbroad release; (2) approving the settlement without finding that the plaintiff was an adequate representative of the corporation's interests; and (3) reducing the objector's fee because the court believed it would have rejected the original settlement agreement without the objection. We recognize that the Court of Chancery and the parties have worked diligently to bring this long-running dispute

3

to a close. Nevertheless, we reverse because the settlement agreement released future claims arising out of, or contemplated by, the settlement itself instead of releasing liability for the claims brought in the litigation.

I.

Shiva Stein filed suit in the Court of Chancery against Goldman Sachs Group ("GS Group") as nominal defendant and its board of directors (the "Defendant Directors" or the "Directors"). The complaint asserted direct and derivative claims. She contended that GS Group's non-employee director compensation was "substantially more than that of the non-employee directors of the four U.S. peer companies that Defendants identified in their 2015, 2016, and 2017 annual meeting proxy statements."[1] Specifically, Stein alleged that a compensation average of $605,000 per year was grossly excessive and therefore the board's approval was a breach of the duty of loyalty. Although non-employee board compensation was approved in 2013 and 2015 under stock incentive plans ("SIPs"), the SIPs set no limit on non-employee director compensation and allowed directors to set their compensation. As such, alleged Stein, the compensation awards were subject to entire fairness review.[2] Stein also claimed that the disclosures relating to the 2013

---

[1] *Stein v. Blankfein*, 2019 WL 2323790, at *3 (Del. Ch. May 31, 2019) (citing the record).
[2] *See In re Inv'rs Bancorp, Inc. Stockholder Litig.*, 177 A.3d 1208 (Del. 2017), *as revised* (Dec. 19, 2017).

4

and 2015 SIPs were incomplete and resulted in an uninformed stockholder vote approving the SIPs.[3]

The Directors moved to dismiss. They argued that stockholder approval of the SIPs resulted, in the Vice Chancellor's words, in an "immaculate ratification."[4] The defendants also claimed that Stein "fails adequately to allege that the self-awarded director compensation was not entirely fair."[5]

Before the court decided the motion to dismiss, the parties reached a settlement (the "2018 Settlement"). Under the proposed settlement:

> 1. Plaintiff's Counsel would be provided with draft proxy disclosures related to the proposed 2018 Stock Incentive Plan, for review and comment before the 2018 Proxy Statement was filed with the U.S. Securities and Exchange Commission;
>
> 2. The Company will make the following disclosures in the 2018 Proxy Statement:
>
> > a. A disclosure that non-employee director compensation is "the highest among its U.S. peers,"
> >
> > b. A disclosure that reiterates the Good Faith Standard, which governs the discretion to make awards under the proposed 2018 Stock Incentive Plan (the "2018 SIP"),
> >
> > c. A disclosure that identifies each class of persons who will be eligible to participate in the proposed 2018 SIP and the approximate number of persons in each of those classes, as required by Schedule 14A (Item 10(a)(1)),

---

[3] *Stein*, 2019 WL 2323790, at *3.
[4] *Id.* at *1.
[5] *Id.*

d.     A disclosure describing the anticipated impact of the Tax Cuts and Jobs Act on the Company's compensation program for named executive officers; and

3.     For three years after the final approval of the Settlement, the Company will continue certain director compensation practices, and disclose them in its annual proxy statements.[6]

Sean Griffith, a GS Group stockholder, objected to the 2018 Settlement. He argued that: (1) the 2018 Settlement included "no cash consideration" and only "immaterial, non-monetary relief[;]"[7] (2) it contained an "intergalactic" release of claims including unknown, antitrust, and foreign claims;[8] and (3) Stein was not an adequate representative to pursue claims on behalf of the corporation. Griffith also argued that Stein's counsel was not entitled to fees, and that Griffith's counsel should receive a fee award for raising meritorious objections to the 2018 Settlement.

The Court of Chancery refused to approve the 2018 Settlement.[9] Although the court recognized that "Delaware policy views the voluntary settlement of legal contests as in the public interest," the settlement provided no benefit to the corporation for settling the derivative claims:

> The Director Defendants support a settlement that voids the derivative claims for damages against them—claims that are assets of the Company—by agreeing to have the Company take or maintain future acts of corporate hygiene. Those actions, largely relating to the direct

---

[6] App. to Opening Br. at A49–83 (Stipulation and Agreement of Compromise, Settlement, and Release, Mar. 20, 2018).

[7] *Id.* at A111, A120, A137–38.

[8] *Id.* at A145.

[9] *Stein v. Blankfein*, 2018 WL 5279358 (Del. Ch. Oct. 23, 2018), *order clarified,* 2018 WL 5733671 (Del. Ch. Oct. 24, 2018).

disclosure claims, may well have merit (although again, to the extent they are valuable, the disclosure claims given up are also valuable). However, they are unrelated to the damages/disgorgement claims for conflicted overpayment that are the heart of the derivative claims.[10]

Even though "no one else has stepped forward to litigate these derivative claims," the court recognized that "the release will prevent the claims from *ever* being litigated."[11] Thus, the court found it unreasonable "to approve a settlement that effectively resolves direct claims belonging to the Plaintiff in return for voiding potentially-meritorious monetary causes of action belonging to the Company."[12]

The court directed the parties to confer on the fees due to Griffith's attorney, given that he conferred a benefit on the corporation by objecting successfully to the settlement. After the parties failed to resolve the issue, the court found that fees were appropriate under the corporate benefit doctrine. As the court held, Griffith had (1) avoided Stein's fee request of $575,000; (2) preserved the compensation claim against the Director Defendants that, if successful, would be worth $8 million; and (3) prevented a release broader than the claims asserted in the complaint. Applying the *Sugarland* factors,[13] the court found first that "[m]ost important to [the court's]

---

[10] *Id.* at *4.
[11] *Id.* (emphasis in original).
[12] *Id.*
[13] *Stein v. Blankfein*, 2019 WL 2750100 at *1 (Del. Ch. July 1, 2019) (citing *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142 (Del. 1980)); *see also id.* at *1 n.8 ("The *Sugarland* factors are: '1) the results achieved; 2) the time and effort of counsel; 3) the complexity of the issues; 4) whether counsel were working on a contingent fee basis; and 5) counsel's standing and ability.'" (quoting *Loral Space & Commc'ns, Inc. v. Highland Crusader Offshore Partners, L.P.*, 977 A.2d 867, 870 (Del. 2009), then citing *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 n.22 (Del. 2012))).

7

analysis here is the benefit created by the Objector."[14] According to the court, Griffith's arguments were "ably briefed and argued" and "helpful in the context of the settlement hearing . . . ."[15] While Griffith's actions "contributed to several benefits for GS Group[,]" the court found that "half of the fee avoidance" from a 1/3 contingency fee was appropriate, or about $96,000.[16] Counsel also worked on a contingent fee basis for 313.7 hours, incurring costs of about $1,900. The court credited Griffith with "the value of the compensation claim" which was yet to be litigated, as well as other unknown claims preserved.[17] As the court held, the issues involved were "complex," "to some extent, novel[,]" and "the value of the claims compromised in the proposed settlement was complicated[,]" all issues that Griffith had helped the court decide.[18] The court awarded Griffith's counsel $100,000 in fees, and $1,923.30 for costs.[19]

With the 2018 Settlement off the table, the parties returned to the motion to dismiss. After briefing and argument, the court dismissed the disclosure claims but otherwise denied the motion.[20] It held that, under the SIPs, the stockholders did not

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.* at *2.
[18] *Id.*
[19] Griffith sought an immediate appeal of the fee award. The Court of Chancery certified the appeal as a collateral final order, but this Court refused the interlocutory appeal. *Stein v. Blankfein*, 2019 WL 3311227 (Del. Ch. July 23, 2019); *Griffith v. Stein on behalf of GS Group Sachs Grp., Inc.*, 214 A.3d 943 (Del. 2019).
[20] *Stein*, 2019 WL 2323790, at *1.

cause the corporation to waive the right to entire fairness review of self-interested director compensation. It also found that the claims were not "particularly strong," but Stein had a "low pleading burden" and succeeded in raising an inference of unfair transactions under an entire fairness review.[21]

After the court denied the motion to dismiss, Stein and the defendants reached a new settlement (the "2020 Settlement"). The 2020 Settlement included "a reduction in compensation of GS Group directors going forward with a then-present value in the range of $4.6 million," as well as changes to GS Group practices, including review of director compensation.[22] The changes would be ratified by a future stockholder vote to approve a 2021 SIP, covering compensation from 2022 through part of 2024 (the "2021 SIP").[23] If the 2021 SIP was not approved as scheduled in March 2021, the claims would not be released.[24]

Relevant to this appeal, the definition of Released Claims included:

> (E) the amount of GS Group's non-employee director compensation to be paid or awarded pursuant to the 2021 SIP as set forth in Paragraphs 2(b)-(d) of this Stipulation, excluding a claim that a non-employee director's service during the period when compensation was paid pursuant to the 2021 SIP served no corporate purpose whatsoever . . . .[25]

---

[21] *Id.* at *8.
[22] *Id.*
[23] *Id.*
[24] *Stein v. Blankfein*, C.A. No. 2017-0354, at 30 (Del. Ch. Aug. 18, 2020) (TRANSCRIPT).
[25] App. to Opening Br. at A497–98.

To support court approval of the settlement, Stein argued that the future claims regarding nonemployee director compensation could be released because, under the agreement, compensation would be capped through April 2024. Stein also claimed that "the releases released claims that the directors are getting excessive compensation in the course of the period going through April 2024 . . . [which] would take effect only if the [2021 SIP] was approved."[26] She contended that "this is not a release of future acts but the implementation of the settlement, and that the claims being released are covered by the allegations of the complaint. They bear the same factual basis and the identical factual predicate."[27] The Directors also pointed out that the "no corporate purpose" carveout was equivalent to a corporate waste exception—the only basis for which a stockholder can sue after stockholders properly ratify a no-discretion compensation plan.[28] According to the Directors, the Court of Chancery has approved settlements that were contingent on future events similar to the stockholder approval of the 2021 SIP.[29]

---

[26] *Stein*, C.A. No. 2017-0354, at *10.

[27] *Id.* at *10–11.

[28] *Id.* at *14–15 (citing *Inv'rs Bancorp*, 177 A.3d 1208).

[29] *Id.* at *15 (citing *Marie Raymond Revocable Tr. v. MAT Five LLC*, 980 A.2d 388 (Del. Ch. 2008), *aff'd sub nom. Whitson v. Marie Raymond Revocable Tr.*, 976 A.2d 172 (Del. 2009) (settlement including a revised tender offer to occur after settlement was approved); *Blank v. Belzberg*, 858 A.2d 336, 341–42 (Del. Ch. 2003) (settlement including closure of merger within 10 days of settlement approval); *In re Schuff Int'l, Inc. S'holders Litig.*, C.A. No. 10323 (Del. Ch. Feb. 13, 2020) (TRANSCRIPT); *In re Medley Cap. Corp. S'holders Litig.*, C.A. No. 2019-0100 (Del. Ch. Nov. 19, 2019) (TRANSCRIPT) (available at Ex. C to Defendant-Appellees Answering Br., hereinafter "DAB")).

Griffith responded that the release in the 2020 Settlement was overbroad because it released claims involving future board action where "a failure to amend the 2021 SIP is a breach of fiduciary duty."[30]  First, Griffith acknowledged that this Court's decision in *In re Investors Bancorp Stockholder Litigation* allows stockholders to ratify compensation plans and channel any challenge to a validly ratified plan through business judgment review instead of entire fairness.[31]  But, according to Griffith, the Court of Chancery has never approved "an exception that permits a release of claims based on future operative facts simply because those claims might be subject to an affirmative defense, even a strong one like ratification."[32]  Griffith also argued that the annual compensation review in the settlement conflicted with the release—if the review determined that the directors were overcompensated and the board did not act, no stockholder could pursue the overcompensation claims.[33]

Continuing his argument, Griffith focused on the difference between the release's "waste" carveout and the language from decisions describing the waste standard.[34]  He argued that the release in the 2020 Settlement was broader than potential waste claims.  The release covered claims that "a nonemployee director's

---

[30] *Stein*, C.A. No. 2017-0354, at *19.
[31] 177 A.3d 1208.
[32] *Stein*, C.A. No. 2017-0354, at *22.
[33] *Id.*
[34] *Id.* at *27.

service served no corporate purpose whatsoever."[35]  The waste standard, on the other hand, covers consideration that is "so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid."[36]  As Griffith argued, in *Feuer on behalf of CBS Corp. v. Redstone*, the court allowed a waste claim to proceed without finding that the compensation served "no corporate purpose whatsoever."[37]

Over these objections, the court approved the 2020 Settlement.  Addressing the release of future claims, the court held, "[i]t seems to me there has to be a forward-looking release of some kind if such a settlement will work because the purpose of a settlement is to provide peace for the issues that are raised in the litigation."[38]  Here, the court held, "the facts are determined" that the compensation would be capped going forward under the SIP to be voted on by the stockholders.[39]  And the court ruled that the language of the carveout did not matter "because the parties to this agreement have made it clear to me that what they're attempting to do is import the Delaware waste standard into their release.  And I have accepted that, and I am relying on that in approving this settlement."[40]  Stein and the Directors'

---

[35] *Id.*

[36] *Id.* at *28 (quoting *Feuer on behalf of CBS Corp. v. Redstone*, 2018 WL 1870074, at *10 (Del. Ch. Apr. 19, 2018)).

[37] *Id.* (citing *CBS Corp.*, 2018 WL 1870074).

[38] *Id.* at *42.

[39] *Id.* at *43.

[40] *Id.* at *43–44.

representations at the settlement hearing, the court ruled, would result in judicial estoppel, precluding the GS Group and the Directors from later arguing the language did not track the waste standard.

The court then turned to the fairness of the settlement itself. Given what it considered the weakness of the claims, the salary reductions going forward, and the $4.6 million common fund, the court found that the 2020 Settlement was "a reasonable and, indeed, a favorable compromise of the claims that were still at issue . . . ."[41] The court also held it was "fair compensation" and that the approval "obviate[d] the need to argue about Ms. Stein's fitness going forward."[42]

Finally, Stein sought a fee award of $1.5 million, including $925,000 for the salary reduction and the rest for the changes in corporate policy.[43] The Directors and Griffith both objected to the size of Stein's requested fee. The Court of Chancery awarded Stein $612,500, considering the size of the fund, Stein's role in litigation, and other factors.[44]

---

[41] *Id.* at *45.

[42] *Id.* at *45–46.

[43] *Id.* at *47, *56. Stein also argued that the value of the fund should be viewed as the entirety of the saved salary, not the present discounted value of future payment savings. *Id.* at 47. The court rejected this argument. *Id.* at 48–49 ("$5 million in hand is not the same thing as $5 million over five years, is it, Mr. Gershon? . . . Could you give me a million dollars, Mr. Gershon, and I'll pay you $100,000 a year for the next ten years?"). *Id.* at *48.

[44] *Stein*, 2021 WL 2926169 at *6.

Griffith moved for fees on top of his prior fee award, arguing that he conferred a corporate benefit with respect to the 2020 Settlement.[45] The court did not award Griffith a new fee. Because his objection failed and the Court of Chancery found the settlement to be fair, the court believed that Griffith had not created a corporate benefit by objecting. The court also revisited the original fee request because Griffith's "real argument" was that he was entitled to more of the common fund than awarded previously.[46] The court observed about its prior award: "I have already found that the Objector's participation was helpful, but not crucial, to my rejection of the 2018 settlement. More to the point, I intended the initial award of fees in the amount of $100,000 to be in full compensation for the benefit created."[47]

Griffith has appealed the Court of Chancery's approval of the settlement and the fee issues. To the extent the trial court's decisions implicate questions of law, we review those questions *de novo*.[48] Otherwise, a settlement "found by the Court

---

[45] Opening Br. at 13.

[46] *Id.* at 7.

[47] *Id.* (internal footnote omitted).

[48] *Alaska Elec. Pen. Fund v. Brown*, 988 A.2d 412, 417 (Del. 2010); *In re Philadelphia Stock Exch., Inc.*, 945 A.2d 1123, 1139 (Del. 2008) (hereinafter, "*PHLX*") ("To the extent the Objectors contend that the Chancellor formulated incorrect legal precepts or applied those precepts incorrectly, this Court reviews those claims *de novo*.").

14

of Chancery to be fair and reasonable" is reviewed for an abuse of discretion.[49] Fee awards are similarly reviewed for abuse of discretion.[50]

## II.

Griffith argues that the Court of Chancery erred when approving the settlement for the following reasons: first, contrary to *In re Philadelphia Stock Exchange, Inc.*, and its holding that stockholder settlements cannot release claims arising out of "operative facts that will occur in the future," the settlement impermissibly releases claims to future non-employee director compensation payments into 2024; and second, the court was required to make findings about Stein's adequacy as a representative of the corporation before approving the settlement. He also asks us to adopt a rule that the Court of Chancery cannot reduce the benefit conferred by an objector when the court might have arrived at the same conclusion independent of the objection.

Stein and the Directors respond that the 2020 Settlement only releases claims related to fixed compensation amounts under the 2021 SIP now ratified by stockholders at the 2021 annual meeting; a plaintiff's fitness as a stockholder representative applies only to class action representatives; and Griffith's proposed

---

[49] *Kahn v. Sullivan*, 594 A.2d 48, 59 (Del. 1991) (citing *Nottingham Partners v. Dana*, 564 A.2d 1089, 1102 (Del. 1989)).

[50] *Sugarland Indus.*, 420 A.2d at 149. *See also EMAK Worldwide*, 50 A.3d at 432 ("We do not substitute our own notions of what is right for those of the trial judge if that judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness." (citing *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011))).

15

rule for assessing an objector's fee request is inflexible and has no support in Delaware law.

## A.

In general, Delaware law favors settlement of litigation.[51] "Settlements are encouraged because they voluntarily resolve disputed matters."[52] They also "promote judicial economy" because "the litigants are generally in the best position to evaluate the strengths and weaknesses of their case."[53]

But settlements involving representative litigation have agency issues.[54] Attorneys representing stockholders might have different incentives for settling litigation rather than litigating claims to the end.[55] Defendants are motivated to

---

[51] *Rome v. Archer*, 197 A.2d 49, 53 (Del. 1964); *see also Polk v. Good*, 507 A.2d 531, 535 (Del. 1986); *Kahn*, 594 A.2d at 58.

[52] *Fins v. Pearlman*, 424 A.2d 305, 309 (Del. 1980) (citing *Neponsit Inv. Co. v. Abramson*, 405 A.2d 97, 100 (Del. 1979)).

[53] *Marie Raymond*, 980 A.2d at 402.

[54] As Vice Chancellor Glasscock succinctly described it in *In re Riverbed Technologies, Inc. Stockholders Litigation*, "much of what I do involves problems of, in a general sense, agency: insuring that those acting for the benefit of others perform with fidelity, rather than doing what comes naturally to men and women—pursuing their own interests, sometimes in ways that conflict with the interests of their principals. In this task, I am generally aided by advocates in an adversarial system, each representing the interest of his client. . . . The area of class litigation involving the actions of fiduciaries stands apart from this general rule . . . . Such cases are particularly fraught with questions of agency: among others, the basic questions regarding the behavior of the fiduciaries that are the subject of the litigation; questions of meta-agency involving the adequacy of the actions of the class representative—the plaintiff—on behalf of the class; and what might be termed meta-meta-agency questions involving the motivations of counsel for the class representative in prosecuting the litigation." 2015 WL 5458041, at *1 (Del. Ch. Sept. 17, 2015), *judgment entered sub nom. In re Riverbed Tech., Inc.* (Del. Ch. 2015).

[55] Amy M. Koopmann, *A Necessary Gatekeeper: The Fiduciary Duties of the Lead Plaintiff in Shareholder Derivative Litigation*, 34 J. Corp. L. 895, 909 (2009) ("Whether a shareholder derivative suit presents a valid claim or not, the plaintiffs' lawyer may stand to receive a large fee

reach an agreement that provides the broadest possible protection from future disputes.[56] With the participants' divergent interests in representative litigation settlements, the court "play[s] a role of fiduciary in its review of these settlements."[57] It "must balance the policy preference for settlement against the need to ensure that the interests of the class [or the corporation] have been fairly represented."[58]

Representative litigation settlement agreements typically include releases that bind stockholders and the corporation and release all liability for claims associated with a challenged transaction.[59] While a settlement release "is an essential, bargained-for element," and a broad release is "intended to accord the defendants 'global peace,'" a release "cannot be limitless."[60] In *In re Celera Corp. Shareholder*

---

from a settlement, even a settlement that brings little or no benefit to the corporation. This may lead attorneys to 'recruit clients and run to the court house' over claims that, if they were to reach trial, would almost certainly fail."); *see also* Julie Rubin, *Auctioning Class Actions: Turning the Tables on Plaintiffs' Lawyers' Abuse or Stripping the Plaintiff Wizards of Their Curtain*, 52 Bus. L. 1441, 1444 (1997) (discussing the class action plaintiff system); Lisa L. Casey, *Reforming Securities Class Actions from the Bench: Judging Fiduciaries and Fiduciary Judging*, 2003 B.Y.U. L. Rev. 1239, 1241 (2003) (discussing the significant monetary payments plaintiffs' attorneys can receive).

[56] *PHLX*, 945 A.2d at 1145 ("In any settlement of litigation, including class actions, a release of claims is an essential, bargained—for element, with the defendants customarily seeking a release with the broadest permissible scope.").

[57] *In re Resorts Int'l S'holders Litig. Appeals*, 570 A.2d 259, 266 (Del. 1990).

[58] *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1283 (Del. 1989).

[59] *See Nottingham Partners*, 564 A.2d at 1106 ("to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action. (quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982))).

[60] *In re Celera Corp. S'holder Litig.*, 59 A.3d 418, 433 (Del. 2012) (quoting *In re Countrywide Corp. Shareholders Litig.*, 2009 WL 846019, at *10 (Del. Ch. Mar. 31, 2009)); *PHLX*, 945 A.2d at 1145 ("the scope of a release of claims cannot be limitless, if only because of substantive due process concerns.").

*Litigation*, we observed that "unless care is taken" when reviewing the terms of a settlement, stakeholders "could have their claims released without an opportunity to be heard."[61]  In the class action context, the Court of Chancery must scrutinize releases to "ensure that the fiduciary nature of the class action is respected, and that its approval of any class-based settlement does not offend due process."[62]

To satisfy due process concerns, "[a] settlement can release claims that were not specifically asserted in an action but can only release claims that are based on the 'same identical factual predicate' or the 'same set of operative facts' as the underlying action."[63]  In other words, "a release is overly broad if it releases claims based on a set of operative facts that will occur in the future.  If the facts have not yet occurred, then they cannot possibly be the basis for the underlying action."[64]

In *In re Philadelphia Stock Exchange* ("*PHLX*"), we relied on the Court of Chancery's decision in *UniSuper Ltd. v. NewsCorp* to define the contours of appropriate releases in representative litigation.[65]  In *UniSuper*, the Court of Chancery reviewed a settlement that released claims covering a rights plan to be

---

[61] *Celera*, 59 A.3d at 434 (quoting Edward P. Welch et al., Mergers & Acquisitions Deal Litigation Under Delaware Corporation Law § 11.01 (2012)).
[62] *Id.* (quoting *Countrywide*, 2009 WL 846019, at *10).
[63] *UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 347 (Del. Ch. 2006) (quoting *Nottingham Partners*, 564 A.2d at 1107; and citing *Steiner v. Sithe–Energies*, 1988 WL 36133, at *2 (Del. Ch. Apr. 18, 1988)).
[64] *PHLX*, 945 A.2d at 1146 (quoting *UniSuper*, 898 A.2d at 347) (alteration omitted).
[65] *Id.*

adopted five months after the settlement.[66]  The court refused to approve the settlement because the rights plan would be adopted in the future and the release dealt with facts that were not operative at the time of settlement approval.  The Court of Chancery stated that:

> Defendants cite no authority for the proposition that there is an exception for future conduct arising out of, or contemplated by, the settlement itself.  Viewed another way, no facts relating to the October 2006 Rights Plan were alleged in the underlying action, much less were they part of the underlying action's operative facts.  For these reasons, I conclude that the release is overly broad in that it attempts to release claims arising from an event that has not yet happened, viz., the October 2006 Rights Plan.[67]

Like the release in *UniSuper*, the 2020 Settlement release released claims contemplated by the settlement itself that were not alleged in the underlying action or part of its operative facts.  The release covers "the amount of [GS Group's] non-employee director compensation *to be paid or awarded* pursuant to the 2021 SIP."[68] The payments under the 2021 SIP cover non-employee director compensation to be paid into 2024.  The 2021 SIP was not scheduled to be approved by the GS Group stockholders until eight months after the settlement.

The Court of Chancery held that the "the facts are determined" because compensation would be capped going forward under the SIP to be voted on by the

---

[66] *UniSuper*, 898 A.2d at 348.
[67] *Id.*
[68] App. to Opening Br. at A497–98 (emphasis added).

stockholders. It is correct that non-employee director payment limits were part of the operative facts of the complaint.[69] But the parties did not limit the release to non-employee director compensation caps. The 2020 Settlement Release is far broader—it bars potential actions that "now or hereafter, are based upon, arise out of, relate in any way to, or involve, directly or indirectly . . . . the amount of [Goldman's] non-employee director compensation to be paid or awarded pursuant to the 2021 SIP . . . ."[70] In other words, the release bars all claims relating to non-employee director compensation into 2024 and not just the cap on compensation.

The arguments to the contrary are unpersuasive. First, Stein and the Directors argue that the 2020 Settlement release tracks the deferential standard of review for claims challenging a properly ratified compensation plan under the requirements in *Investors Bancorp*. As they characterize the release, it "merely releases claims that are already barred by this Court's *Investors Bancorp* decision."[71]

In *Investors Bancorp*, we held that advance stockholder approval of a compensation plan can only ratify future grants if the plan is self-executing, sets forth specific grants, or has a formula for calculating grants.[72] If the compensation

---

[69] App. to Opening Br. at A34–35 ("The Stock Plan places no limit on the amount of compensation the Board may award a director. For directors and all other participants, the Stock Plan places no individual limitation on the number or value of (a) restricted shares, (b) RSUs, (c) dividend equivalent rights, and (d) other equity-based or equity-related Awards under the Stock Plan.").

[70] *Id.* at A497.

[71] DAB at 23.

[72] *Inv'rs Bancorp*, 177 A.3d at 1223.

20

plan is a non-discretionary plan, the compensation awards are reviewed under the deferential business judgment standard of review, meaning excessive compensation can be challenged only for waste.[73]  According to the Directors and Stein, the 2020 Settlement release tracks *Investors Bancorp* and exempts claims for waste.  Thus, they argue, the 2020 Settlement release does not release any valid stockholder claims.

Even if the release does not release claims carved out by *Investors Bancorp*, it is still overbroad.  The 2020 Settlement bars challenges to "the amount of GS Group's non-employee director compensation to be paid or awarded pursuant to the 2021 SIP . . . excluding a claim that a nonemployee director's service during the period when compensation was paid pursuant to the 2021 SIP served no corporate purpose whatsoever . . . ."[74]  Griffith posits several issues relating to non-employee director compensation that do not fall under *Investors Bancorp*, such as a corporate scandal involving the Board, where a remedy might include disgorgement of compensation from directors, and instances when companies decided not to pay directors.[75]  There is also a difference between the 2020 Settlement release and the *Investors Bancorp* ratification defense: one extinguishes claims while the other acts

---

[73] *Id.*

[74] *Stein*, 2021 WL 3144725, at *3.

[75] Opening Br. at 24 n.7.  Griffith lists several examples of situations where the "waste" exception would not match the *Investors Bancorp* standard—a significant drop in peer compensation, changes in tax law, or an instance where GS Group might be subject to an international investigation, which might affect director compensation.  App. to Opening Br. at A637–38.

as a deferential standard of review when evaluating those claims.[76]  In other words, a defense under *Investors Bancorp* invoking a deferential standard of review is asserted by a defendant—and does not bar a claim entirely.

The cases cited by the Directors and Stein are distinguishable.  The Directors first rely on *In re Medley Capital Corp. Shareholders Litigation*.[77]  In *Medley*, however, the parties cabined their settlement to avoid releasing future claims.  As the court observed, "the stipulation of settlement originally proposed the release of claims arising through the date of the closing of the amended merger.  After execution of the settlement, the parties agreed to amend the release to limit its scope to claims that were or could have been asserted through the date of the settlement hearing."[78]

For the other cases cited by the Directors, it appears that neither the parties nor the court raised the question of the validity of forward-looking releases.  Several

---

[76] *See also Gantler v. Stephens*, 965 A.2d 695, 713 (Del. 2009) ("With one exception, the 'cleansing' effect of such a ratifying shareholder vote is to subject the challenged director action to business judgment review, as opposed to 'extinguishing' the claim altogether (*i.e.,* obviating all judicial review of the challenged action)."

[77] DAB at 27–28 (quoting *In re Medley Cap. Corp. S'holders Litig.*, C.A. No. 2019-0100, at 38:2-6 (Del. Ch. Nov. 19, 2019) (TRANSCRIPT)).

[78] *Medley*, C.A. No. 2019-0100, at 33.  The main issue in Medley was whether the settlement could "release claims as to all historical aspects of the amended agreement despite the fact that certain terms are unrelated to the litigated issues"—a question of "operative facts," not a future-looking issue. *Id.* at 37.

22

pre-date our ruling in *PHLX*.[79] And in *Marie Raymond Revocable Tr. v. MAT Five LLC*, the objectors only disputed whether the release could include federal securities claims pending elsewhere, not whether it could include future claims.[80]

Many settlements include forward-looking reforms. But a release that directly or indirectly binds absent interested parties is limited by the Due Process Clause. The 2021 SIP was not part of the underlying litigation. It arose out of the settlement itself. The 2020 Settlement release barred future claims challenging non-employee director compensation awards through part of 2024. The Court of Chancery erred in approving the 2020 Settlement with an overbroad release.

## B.

While we reverse the Court of Chancery's settlement approval, to be helpful to the court on remand we address the other issues raised on appeal. Griffith claims that the court erred by not assessing Stein's adequacy as a derivative plaintiff to represent the corporation's interests before approving the settlement.[81] Although the

---

[79] Reply Br. at 5 (citing *In re Coleman Co. Inc. S'holders Litig.*, 750 A.2d 1202 (Del. Ch. 1999); *In re AXA Fin. Inc.*, 2002 WL 1283674 (Del. Ch. May 22, 2002); *Blank v. Belzberg*, 858 A.2d 336 (Del. Ch. 2003)). In *Blank*, the release explicitly carved out claims relating to the merger that was to take place after the settlement, albeit within a short timeframe. *Blank*, 858 A.2d at 341–42. It did not, therefore, "release[] claims based on a set of operative facts that will occur in the future." *PHLX*, 945 A.2d at 1146.

[80] *Marie Raymond Revocable Tr.*, 980 A.2d at 406. *In re Sirius XM Shareholder Litigation* is also no help to Stein and the Directors. In *Sirius XM*, the court did not address a settlement or the scope of a settlement release. It dealt with a statute of limitations issue. 2013 WL 5411268, at *5 (Del. Ch. Sept. 27, 2013).

[81] Opening Br. at 31.

parties agreed to settle derivative claims governed by Court of Chancery Rule 23.1, Griffith argues that Stein is essentially a class action plaintiff, and the settlement should be treated like a class action under Rule 23, meaning that the Court of Chancery must assess Stein's adequacy as a plaintiff before approving a settlement. He argues that she is unfit as a representative because she is a frequent filer and is motivated to release the corporation from all stockholder claims in exchange for fees to her attorneys.

In a class action, the plaintiff acts in a representative capacity for a class of stockholders bringing direct claims against the corporation and other defendants. To maintain a class action, one or more members of a class may act as the representative plaintiff if, among other requirements in Court of Chancery Rule 23, "the representative parties will fairly and adequately protect the interests of the class."[82] When the Court of Chancery reviews a settlement of class action litigation, and certifies a class, Rule 23 requires that the court make a finding that the plaintiff is an adequate class representative.[83]

In a derivative action, the plaintiff files suit and seeks to act in a representative capacity for the corporation. Although Federal Rule of Civil Procedure 23.1 states

---

[82] Del. R. Ch. Ct. 23.

[83] *Prezant v. De Angelis*, 636 A.2d 915, 917 (Del. 1994) ("Because adequacy of a class representative is a requirement of Court of Chancery Rule 23 and is constitutionally mandated, a determination to that effect is essential to court approval of a class action settlement.").

that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association," Delaware Court of Chancery Rule 23.1 does not contain a similar requirement.

Yet the Court of Chancery has long implied an adequacy requirement under Rule 23.1 to maintain a derivative action. For example, in *Katz v. Plant Industries, Inc.*, the court held it was "satisfied that the addition to the federal rule [of an adequacy requirement] merely made explicit what was already implicitly a part of the Federal as well as the Delaware rule."[84] Drawing on federal law, the Court of Chancery implied an adequacy requirement, "namely[,] that a plaintiff shareholder in a derivative action must be qualified to serve in a fiduciary capacity as a representative of a class of persons similarly situated . . . ."[85]

The *Katz* decision in 1981 was soon followed by *Youngman v. Tahmoush*, where the Court of Chancery reasoned:

> While the only explicit standing requirement for maintaining a derivative suit is that the plaintiff be a stockholder of the corporation at the time of the transaction of which he complains, or that his stock thereafter devolves upon him by operation of law, this Court has recognized additional implicit requirements. Simply put, the plaintiff in a derivative action must be qualified to serve in a fiduciary capacity as a representative of a class, whose interest is dependent upon the representative's adequate and fair prosecution. Despite the lack of a specific requirement in Rule 23.1 as to the competency of a stockholder

---

[84] 1981 WL 15148, at *1 (Del. Ch. Oct. 27, 1981).
[85] *Id.*

25

derivative plaintiff, the imposition of an adequacy of representation requirement for derivative suits is entirely consistent with that which is utilized in Rule 23 relating to class actions because the plaintiff in both types of suits acts as a fiduciary. The cases interpreting Rule 23, therefore, may be effectively used in analyzing the implied competency requirement under Rule 23.1.[86]

Since *Katz* and *Youngman*, the Court of Chancery has implied an adequacy requirement in Rule 23.1 to maintain a derivative action.[87] It has also held that, to disqualify a derivative plaintiff for lack of adequacy, the defendant bears the burden of proof.[88] As far as we can discern, however, neither our Court nor the Court of Chancery has addressed whether an adequacy finding is required before the court can approve a derivative suit settlement.

Court of Chancery Rule 23.1 contains express requirements to settle derivative claims. The plaintiff's adequacy as a representative of the corporation's interest is not one of them. Absent an express requirement in Court of Chancery

---

[86] 457 A.2d 376, 379 (Del. Ch. 1983).

[87] *Emerald Partners v. Berlin*, 564 A.2d 670 (Del. Ch. 1989); *In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 129 n.2 (Del. Ch. 1999); *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *10 (Del. Ch. Oct. 10, 2006); *Canadian Commercial Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *8 (Del. Ch. Feb. 22, 2006). *See also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.02[b] [1], at 9–31 to –32 (2012); David A. Drexler, Lewis S. Black, Jr. & A. Gilchrist Sparks, III, *Delaware Corporation Law & Practice* § 42.03[3] (2002).

[88] *South v. Baker*, 62 A.3d 1, 22 (Del. Ch. 2012) (quoting *Emerald P'rs*, 564 A.2d at 674; and citing *Bakerman*, 2006 WL 3927242, at *10; *Alden*, 2006 WL 456786, at *8). The Court of Chancery in *South* raised the adequacy issue on its own, relying on class action precedent. *Id.* ("In a representative action, a trial court has an independent and continuing duty to scrutinize the representative plaintiff to see if she is providing adequate representation and, if not, to take appropriate action. (citing *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 955 (Del. Ch. 2010))).

Rule 23.1 that the Court determine the adequacy of a derivative plaintiff before approving a settlement of litigation, we are reluctant to imply such a requirement. We also agree with the court's observation in this case that the objector's vigorous participation in the proceedings and the court's independent review of the 2020 Settlement protected against agency concerns. We recommend, however, that the Court of Chancery Rules Committee consider amendments to Rule 23.1, to include whether to make the plaintiff's adequacy an express requirement to maintain a derivative action consistent with Federal Rule of Civil Procedure 23.1, to consider the burden of proof issue, and to consider whether an adequacy finding must be made before court approval of a derivative litigation settlement, consistent with due process requirements.[89]

## C.

Finally, Griffith argues that the court erred when it commented during its bench ruling that, when awarding fees for the successful objection to the 2018 Settlement, it considered whether it might have come independently to the same conclusion regarding the objection. He argues that allowing courts to consider this factor will lead to weaker arguments and disincentivize strong objections.

---

[89] See *South*, 62 A.2d at 21 (observing that a derivative plaintiff serves in a fiduciary capacity, and to maintain a derivative action she must show that she can meet her ongoing fiduciary obligations consistent with the Due Process Clause and "the protection it affords the non-parties on whose behalf the representative plaintiff purports to litigate.").

While there is support for the proposition that a court should not discount a fee award based on the obviousness of the flaws in a settlement submitted for court approval,[90] we review the court's fee award for abuse of discretion.[91] The Court of Chancery did not place undue weight on this issue and undertook a thoughtful analysis of the *Sugarland* factors when deciding the fees to be awarded for successful objection to the 2018 Settlement. Thus, the court did not abuse its considerable discretion when deciding the appropriate fee award.

### III.

The judgment of the Court of Chancery is reversed, and the case is remanded for further proceedings consistent with this opinion. Jurisdiction is not retained.

---

[90] *See Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 288 (7th Cir. 2002) ("The judge denied a fee to the objectors in part on the ground that he had already decided, without telling anybody, not to accept the reversion. But objectors must decide whether to object without knowing what objections may be moot because they have already occurred to the judge."); *Green v. Transition Elec. Corp.*, 326 F.2d 492, 499 (1st Cir. 1964) ("We think it unfair to counsel when, seeking to protect his client's interest and guided by facts apparent on the record, he spends time and effort to prepare and advance an argument which is ultimately adopted by the court, but then receives no credit therefor because the court was thinking along that line all the while. . . . His attorneys should not be denied compensation for reasons not apparent on the record, especially when the objections advanced resulted in a benefit to the class involved in the proceedings." (citing *Sprague v. Ticonic Nat. Bank*, 307 U.S. 161, 166–67 (1939)); *White v. Auerbach*, 500 F.2d 822, 829 (2d. Cir. 1974) (agreeing that objectors' counsel was entitled to an evidentiary hearing on how much their objection had contributed to the rejection of a settlement even where the trial judge had not noted that their objection was helpful and noting that the situation was analogous to *Green v. Transition*).
[91] *Alaska*, 988 A.2d at 417.

28